UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

CHINA AI CAPITAL LIMITED, a British
Virgin Islands limited company, derivatively
on behalf of LINK MOTION INC., a Cayman
Islands limited company f/k/a NQ MOBILE
INC.,

               Plaintiff,

    -against-

DLA PIPER LLP (US), a Maryland limited
liability partnership, and CARYN G.
SCHECHTMAN, a natural person,

              Defendants,

    -and-

LINK MOTION INC., a Cayman Islands
limited company f/k/a NQ MOBILE INC.

              Nominal Defendant.

--------------------------------------------------------------x

Case No. 1:21-cv-10911 (VM)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION SEEKING SANCTIONS PURSUANT TO RULE 11

**TABLE OF CONTENTS**

**CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 3

I.      Link Motion, Dr. Shi, And Other Board Members Are Sued In The *Baliga* Action.......... 3

II.     Link Motion Declined To Retain Defendants To Defend The *Baliga* Action.................... 4

III.    China AI's Counsel, Who Also Represent Dr. Shi In The *Baliga* Action And Link Motion In The State Court Action, Never Raised The Purported Standing Argument That Is The Linchpin Of China AI's Negligence Claim Against Defendants ................................................................................................................... 7

IV.    China AI And Its Counsel Have Made Demonstrably False Allegations And Conjured A Sham Arbitration Engineered By Dr. Shi ....................................................... 8

V.     China AI And Its Counsel Knew That Link Motion Completed The FL Mobile Transaction Well Before The *Baliga* Action Was Even Filed........................................... 9

VI.    China AI And Its Counsel Knew When They Filed The Complaint Here That The Tongfang Award Was A Sham Orchestrated By Dr. Shi ................................................. 10

VII.   China AI And Its Counsel Refused To Withdraw Their Frivolous Complaint Even After China AI's Core Standing Argument Was Rejected In The *Baliga* Action ............ 12

VIII.  China AI And Its Counsel Refused To Withdraw Their Complaint Even After Defendants Explained With Evidence That It Was False And Legally Frivolous ........... 13

DISCUSSION ........................................................................................................... 14

I.      CHINA AI AND ITS COUNSEL FILED A COMPLAINT PREMISED ON DEMONSTRABLY FALSE ALLEGATIONS IN VIOLATION OF RULE 11(b)(3) ...................................................................................................................... 15

      A.     Transfer Of The FL Mobile Shares Was Completed In 2017, and the Tongfang Arbitration was a Sham Manufactured by Dr. Shi .............................. 16

      B.     China AI And Its Counsel Knew Defendants Were Never Retained or Engaged in the *Baliga* Action ............................................................................ 18

II.     CHINA AI AND ITS COUNSEL FILED A FRIVOLOUS CLAIM WITH NO CHANCE OF SUCCESS IN VIOLATION OF RULE 11(b)(2)..................................... 20

      A.     China AI Cannot Establish Multiple Elements Of Its Claim............................... 21

      B.     China AI Lacks Standing Under Applicable Cayman Islands Law...................... 23

**TABLE OF CONTENTS**
(continued)

Page

III.   CHINA AI AND ITS COUNSEL FILED THE COMPLAINT FOR AN
       IMPROPER PURPOSE IN VIOLATION OF RULE 11(b)(1) ....................................... 25

CONCLUSION .................................................................................................................... 25

**Cases**

*Abbas v. Orrick, Herrington & Sutcliffe, LLP*,
    2016 WL 1071033 (S.D.N.Y. Mar. 16, 2016) ...................................................21

*Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*,
    1998 WL 410958 (S.D.N.Y. July 22, 1998) .....................................................25

*AJ Energy LLC v. Woori Bank*,
    2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019) .............................................15, 20

*Allegrino v. Ruskin Moscou Faltischek, P.C.*,
    2021 WL 5500084 (2d Cir. Nov. 24, 2021) ................................................21, 23

*AmBase Corp. v. Davis Polk & Wardwell*,
    8 N.Y.3d 428 (2007) ......................................................................................23

*Binghamton Masonic Temple, Inc. v. Bares*,
    168 F.R.D. 121 (N.D.N.Y. 1996) ...................................................................20

*Bletas v. Deluca*,
    2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) ...........................................21, 25

*Colliton v. Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ............................................14, 20

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) .........................................................................................3

*Edwards v. Barclays Servs. Corp.*,
    2020 WL 3446870 (S.D.N.Y. June 24, 2020) .................................................14

*Flutie Bros. v. Hayes*,
    2006 WL 1379594 (S.D.N.Y. May 18, 2006) .................................................23

*Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*,
    166 F. Supp. 2d 805 (S.D.N.Y. 2001) ...........................................................15

*Goldman v. Barrett*,
    825 F. App'x 35 (2d Cir. 2020) .....................................................................15

*Heritage Partners, LLC v. Stroock & Stroock & Lavan LLP*,
    19 N.Y.S.3d 511 (2015)..................................................................................22

*Howard v. Klynveld Peat Marwick Goerdeler*,
    977 F. Supp. 654 (S.D.N.Y. 1997)............................................................20, 21

**Page(s)**

*Howe v. Bank of New York Mellon,*
    783 F. Supp. 2d 466 (S.D.N.Y. 2011)................................................................23, 24

*Judd Burstein, P.C. v. Long,*
    797 F. App'x 585 (2d Cir. 2019) ......................................................................22

*Levine v. F.D.I.C.,*
    2 F.3d 476 (2d Cir. 1993) ................................................................................15

*O'Malley v. New York City Transit Auth.,*
    896 F.2d 704 (2d Cir. 1990).............................................................................25

*Renren, Inc. v. XXX,*
    2020 WL 2564684, (N.Y. Sup. Ct. May 20, 2020)........................................24

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP,*
    552 F. App'x 79 (2d Cir. 2014) ..........................................................21, 22, 23

*In re Sept. 11th Liab. Ins. Coverage Cases,*
    243 F.R.D. 114 (S.D.N.Y. 2007) .....................................................................15

*Shenwick v. HM Ruby Fund, L.P.,*
    106 A.D.3d 638 (1st Dep't 2013) .....................................................................24

*Sussman v. Bank of Isr.,*
    56 F.3d 450 (2d Cir. 1995)...............................................................................20

*Winn v. Schafer,*
    499 F. Supp. 2d 390 (S.D.N.Y. 2007)..............................................................24

*Yeremis v. Amerit Fleet Sols.,*
    2021 WL 1565693 (S.D.N.Y. Apr. 21, 2021)..................................................14

**Rules**

Fed. R. Civ. P. 11 ............................................................................... *passim*

DLA Piper LLP (US) ("DLA") and Caryn G. Schechtman (collectively "Defendants"), respectfully request Rule 11 sanctions against Plaintiff China AI Capital Limited ("Plaintiff" or "China AI") and its counsel, Michael Maloney and Rosanne Felicello of Felicello Law P.C. ("Counsel"), for filing the frivolous Complaint in this action ("Compl.," ECF 1).[1]

## PRELIMINARY STATEMENT

In December 2021, Plaintiff and its Counsel filed this derivative action, purportedly on behalf of Link Motion, Inc. ("Link Motion"), premised on allegations that conflict with Link Motion's publicly-filed documents and the communications cited in the Complaint. The cases they relied upon also confirm that their legal malpractice claim fails as a matter of law. Consequently, Plaintiff has no chance of establishing *multiple* required elements of their claim.

In March 2022, Defendants sent an extensive Rule 11 letter identifying of all of these infirmities. For example, Defendants supposedly "prevented [Link Motion] from fulfilling its obligations under a pre-existing contract" to transfer its interests in FL Mobile to Tongfang, and "result[ed] in an arbitration award of more than USD$390,000,000 against the Company." Compl., ¶ 8. Yet multiple Link Motion SEC filings expressly state that Link Motion "completed" the FL Mobile divestment in December 2017. And the purported "Tongfang Award" itself—the centerpiece of the Complaint's damages theory—confirms that the Tongfang Arbitration was a sham orchestrated by Dr. Vincent Shi—a defendant represented by Plaintiff's Counsel in the underlying lawsuit (the "*Baliga* Action")—in blatant violation of this Court's Orders in that case.

Equally reprehensible, well-established law, including in particular caselaw *cited in the Complaint*, plainly established that China AI had no standing to sue Defendants derivatively on

---

[1] References to "ECF" are to the docket in this action; "Dkt" refers to filings in *Baliga v. Link Motion Inc. et al.*, 1:18-cv-11642 (the "*Baliga* Action"). Pin cites are to the page numbers applied by the Court.

behalf of Link Motion. Plaintiff's contrary argument is based on still more false allegations, and in the *Baliga* Action Magistrate Judge Freemen found (in a Report and Recommendation that was adopted in full by this Court) that the defense Plaintiff claims DLA negligently failed to raise *would not have changed the outcome* in that case.

Beyond that, DLA was never engaged to represent Link Motion in the *Baliga* Action and thus had no duty to research and identify a purported "defense based on Baliga's lack of standing," Compl., ¶¶ 59, 70, as the public record and contemporaneous communications (including those cited by Plaintiff) confirm. Rather, Defendants *for weeks* repeatedly asked Dr. Shi if Link Motion wished to retain DLA and how to respond to the *Baliga* complaint. When Link Motion utterly "failed to cooperate in the representation by failing to respond" to Defendants, and indicated that "it d[id] not have sufficient assets and cannot pay DLA's legal fees at this time," Defendants were compelled to withdraw. Dkt. 28 at 6.

Despite the foregoing and more, Plaintiff and its Counsel persisted with this lawsuit for six months with their irresponsible and personally damaging allegations against Caryn Schechtman and DLA. Defendants thus incurred considerable time and expense to obtain leave from Magistrate Judge Figueredo to file their motion to dismiss. Only then did Plaintiffs abruptly request to voluntarily dismiss this action without prejudice. Thereafter, without waiting for the Court to rule, and failing to follow the notice requirements under Rule 23.1, Plaintiff's Counsel filed a copy-cat lawsuit in New York state court, purportedly on behalf of Link Motion—in violation of the Receivership Order and the Court's recent ruling in the *Baliga* action that no actions be taken before the dissolution of the Receivership, which has not yet occurred. Of course, that state court lawsuit suffers from the same legal deficiencies as the Complaint here.

Enough is enough. Plaintiff and Plaintiff's Counsel's penchant for obfuscation, false and

conflicting allegations, and frivolous legal arguments must be stopped.  Their desperate attempt to side-step the consequences of their actions by requesting to voluntarily dismiss this action without prejudice does not mitigate the costly and unnecessary burden they imposed on Defendants, Magistrate Judge Figueredo and this Court.  *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) (holding voluntary Rule 41(a)(1)(i) dismissal does not deprive a district court of jurisdiction because Rule 11's policy includes "deterring baseless findings" and "if a litigant could purge his Rule 11 violation merely by taking a dismissal, he would lose all incentive to investigate more carefully before serving and filing papers").

Plaintiff and Plaintiff's Counsel failed (and continue to fail) to conduct "an inquiry reasonable under the circumstances;" they couldn't have reasonably concluded that "the factual contentions" in the Complaint "have evidentiary support" or that their meritless cause of action is warranted by "existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;" and the complaints here and in state court were plainly filed for the "improper purpose" of extorting Defendants.  Fed. R. Civ. P. 11(b)(1)–(3).

Accordingly, Defendants respectfully request that Rule 11 sanctions be imposed jointly and severally against Plaintiff and Plaintiff's Counsel.  Defendants stand ready to provide to the Court evidence of their fees and costs attributable to such malfeasance upon a factual finding by this Court of all of the foregoing and the facts and law set forth below.

<u>**FACTUAL AND PROCEDURAL BACKGROUND**</u>

I.     **Link Motion, Dr. Shi, And Other Board Members Are Sued In The *Baliga* Action**

Plaintiff China AI purports to be a registered shareholder of Link Motion, a technology business originally founded in China by Dr. Henry Yu Lin, Mr. Xu Zhou, and Dr. Vincent Wenyong Shi.  Compl., ¶¶ 1, 18.  Link Motion was incorporated as a limited company in the Cayman Islands in 2007, and, in 2011, completed a public offering of American depository shares

("ADS") on the New York Stock Exchange. *Id.*, ¶ 18. In 2014, Dr. Shi became chairman of the Link Motion board of directors. *Id.*, ¶ 20.

On December 13, 2018, Baliga filed a shareholder suit in this Court against Link Motion and several of its officers and directors. Dkt 1. One of those director defendants was Dr. Shi, whom Baliga accused of having orchestrated "a massive, multi-year fraud" and "looting [Link Motion's] most valuable assets [to] lin[e] [his] pockets." Dkt 166 ¶ 1; *see also* Dkt 1 at ¶ 3. Baliga requested that the Court appoint an independent receiver. Dkt 1 at ¶¶ 36–54. Plaintiff's Counsel here also represents Dr. Shi in the *Baliga* Action, Dkt 35, 38 (as well as purportedly Link Motion in the New York state action)—a blatant conflict of interest.

## II. Link Motion Declined To Retain Defendants To Defend The *Baliga* Action

After the *Baliga* Action was filed, Baliga filed an OSC for a preliminary injunction and temporary receiver and requested a TRO to prevent any further transfer or dissipation of Link Motion's assets. Dkt 7. Because DLA had previously represented Link Motion in a corporate matter—the issuance of Class B shares to China AI—Baliga's counsel unilaterally wrote to DLA, alerting them of Baliga's intention to file the OSC the next day. Ex. A at 1. Ms. Schechtman promptly forwarded the email to Dr. Shi and another Link Motion director, stating "[p]lease instruct DLA if you would like us to respond. We should have a call immediately to discuss — as action will be taking place tomorrow. In addition DLA has still not received a retainer so we would need to receive that as well." *Id.*

Ms. Schechtman followed up that same day, asking "[d]id you see the lawsuit that was filed. They are going into court in 12 hours to get a restraining order against the company." Ex. B at 4. In light of the imminent filing, and although DLA had not been retained, she offered to "send an associate" to inform the Court "that we have received no instruction from the Company due to the time difference and language barriers." Ex. C at 1; *see also* Ex. B at 3. Dr. Shi replied

4

simply, "OK, thanks." Ex. B at 3.

On December 14, 2018, the Court granted the TRO. Dkt 7. Meanwhile, Defendants continued to seek direction from Link Motion. On December 17, Ms. Schechtman asked Dr. Shi, "Vincent we need to discuss how the company wants us to handle the derivative action." Ex. B at 4. On December 18, Ms. Schechtman again urged Dr. Shi, "[w]e have to discuss the derivative action. We need to enter a scheduling order on Friday US." *Id.* She also pressed Dr. Shi to "please bring us current on invoices" outstanding from DLA's prior work for Link Motion. *Id.* at 3.

Dr. Shi asked DLA to obtain additional time for Link Motion to respond to the motion for preliminary injunction. On December 21, 2018, the parties filed a joint letter in which Link Motion agreed to extend the TRO and requested a deadline of January 21, 2019 to respond to Baliga's motion. Dkt 20. The Court agreed on December 27. Dkt 21.

DLA then spent more than a month asking Link Motion, with increasing urgency, how it wanted to proceed, including whether Link Motion wanted to retain DLA:

- On December 28, Ms. Schechtman said DLA couldn't take on the new matter without "payment on outstanding invoices" for prior corporate work. Ex. B at 2. Link Motion didn't respond.

- On January 6, 2019, Ms. Schechtman warned, "[W]e won't be able to draft the briefs that are due on [t]he 21st. Because we can't open the matter as we have not received the retainer and we are not up to date on payment." *Id.* Link Motion didn't respond.

- On January 7, Ms. Schechtman again pressed: "Let me know when we can speak. The insurance policy has a 2.5 million dollar retention which means it won't kick in until the company has paid 2.5 million toward legal fees." *Id.* Hours later she added, "Can we speak?" *Id.* Link Motion didn't respond.

- On January 14, Ms. Schechtman yet again asked for direction: "When can we speak. I need to let the other side and the court know what we are doing. We have to start drafting today. It's one week out. . . ." *Id.* Link Motion didn't respond.

- On January 14, DLA wrote to the Link Motion Board in both English and Mandarin, warning "Defendants opposition to Plaintiff's motion is due next Monday, January 21 . . . . ***If we do nothing, the motion may be granted, which may include such relief as***

*appointing a receiver over the company and a preliminary injunction restricting the Company from transferring assets*.” Ex. D at 2.[2] DLA also noted: “*We have repeatedly asked for instruction on how to proceed but have not received any guidance from the Company* or the individual defendants and advised that *if we do not receive payment for legal services, we cannot take on this litigation matter*.” *Id.* at 3. Nobody responded.

- Ms. Schechtman then pleaded with Dr. Shi, “[p]lease advise,” adding “[i]f I do not hear from you in 24 hours *I will need to alert the Court that we have not been engaged to proceed further on the Company's behalf*.” Ex. B at 2. Dr. Shi didn't respond.

- On January 17, Ms. Schechtman again wrote to Dr. Shi: “I have not heard from you. We have not prepared briefs and *will not be in a position to represent the company in the derivative action*. … I want to avoid withdrawing as Counsel on the derivative action because it will look bad for the company. Instead I would prefer for the company to agree that it isn't submitting papers on Jan 21. . . . But we need to discuss.” *Id.* at 1–2. Hours later, she added “We must speak. When can you talk?” and “*I need you to confirm that we can tell the court you aren't responding*.” *Id.* at 1. Dr. Shi didn't respond.

- On January 18, DLA again wrote to the Link Motion Board in both English and Mandarin: “*We have not heard back from you* on [DLA's January 14 email]. As a result, *if we do not hear back from you within 24 hours, DLA will assume that we have Link Motion's consent not to oppose the motion* . . . . [I]f Link Motion does not respond, the motion may be granted, which may include such relief as appointing a receiver over the company and a preliminary injunction restricting the Company from transferring assets, attorneys' fees and costs, and other such relief that the Court may deem appropriate.” Ex. D at 1. Further, she said that if Link Motion continued to ignore the matter, DLA would “assume that we have Link Motion's consent to withdraw from representation” and inform the Court that Link Motion “will not submit an opposition” to Baliga's motion. *Id.* Nobody responded.

- Ms. Schechtman also contacted Dr. Shi: “Vincent please call me. we need to speak.” Ex. B at 1. She also wrote to both Dr. Shi and Crystal Zhanglu, a Link Motion Senior Legal Manager, stating: “Crystal it is important that I speak with you and Vincent as soon as possible. When can we speak." *Id.* at 4. Neither Dr. Shi nor Ms. Zhanglu responded.

- On January 20, Ms. Schechtman again pressed Dr. Shi: “Vincent - you owe me the courtesy of a call. Please call me.” *Id.* at 1. Dr. Shi finally responded, stating only that he would call her soon. *Id.*

- Later that day, Ms. Schechtman asked Dr. Shi: “Do you want us to do the answer. We will need some payment. Otherwise I'm not sure what to recommend.” *Id.* She added “*I would like your consent for us to withdraw as your counsel from the litigation if you determine not to pay us to go forward*. . . . I am trying to do what is best for the company but we cannot work for no payment.” *Id.* Dr. Shi didn't respond.

---

[2] All emphasis added unless otherwise noted.

- Ms. Schechtman also sent to Dr. Shi a draft email to Baliga's counsel, offering to agree not to oppose the preliminary injunction in exchange for more time to answer the Complaint and attaching a draft stipulation. Ex. E at 1. Dr. Shi didn't respond.

- On January 21, Ms. Schechtman wrote, "Vincent pls respond. The other option is we also withdraw as Counsel now." Ex. B at 1. Dr. Shi responded: "Thanks Caryn, I fully respect and appreciate your excellent work. But at this moment, it's very hard to make any further payment arrangement, even employees' payrolls were impacted. I'm very sorry about this situation and also bear huge pressure from many parties. I still try my best to solve issues or at least to maintain the company. But it is very hard to predict the timeframe and the results." *Id.*

Link Motion then "determin[ed] not to oppose the OSC" in the *Baliga* Action, Dkt 28 at 6, and, in a "Proposed Stipulation and Order" filed on January 21, 2019, agreed not to oppose Baliga's motion in exchange for additional time to answer his complaint. Dkt 22. On February 1, the Court granted a preliminary injunction and appointed a Receiver. Dkt 26 ("*Baliga* PI Order"). On March 1, DLA sought (and received) leave to withdraw because Link Motion "has indicated that it does not have sufficient assets and cannot pay DLA's legal fees . . . [and] has failed to cooperate in the representation by failing to respond to inquiries." Dkt 28 at 3–4; ¶ 82.

### III. China AI's Counsel, Who Also Represent Dr. Shi In The *Baliga* Action And Link Motion In The State Court Action, Never Raised The Purported Standing Argument That Is The Linchpin Of China AI's Negligence Claim Against Defendants

Dr. Shi thereafter retained Plaintiff's Counsel here to defend the *Baliga* Action.[3] Dkt 35–38. They appeared at a hearing on March 29, 2019 where Baliga's counsel first represented that Baliga held Link Motion ADS, and thus was not a registered shareholder. *See* Dkt 41 at 19:15-19. Baliga filed proof of that fact on April 26, 2019. Dkt 49, 49–8.

---

[3] There are significant ties between China AI and Dr. Shi beyond their joint counsel. The court-appointed Receiver in the *Baliga* Action has uncovered evidence that Dr. Shi is "directly connected to" and "control[s]" China AI, and that he engineered China AI's acquisition of Link Motion shares. Dkt 220-2 at 3; Dkt 220-3 at 2; *see also* Dkt 141 at 8–10.

Plaintiff alleges that, due to his status as an ADS-holder instead of a "registered shareholder," Baliga lacked derivative standing, and that DLA's purported failure to raise this "meritorious defense" constitutes "malpractice." ¶¶ 65, 81. Yet Plaintiff's Counsel, who unlike DLA was retained to research grounds for dismissal and seek to dismiss the Complaint, never argued that Baliga lacked standing because he was an ADS-holder, including in a then-pending motion to dismiss and discharge the Receiver. Dkt 62. In fact, Plaintiff's Counsel didn't raise that argument for two years, *see* Dkt 230 at 8, 21–22.[4]

## IV. China AI And Its Counsel Have Made Demonstrably False Allegations And Conjured A Sham Arbitration Engineered By Dr. Shi

On December 20, 2021, China AI filed this derivative action, alleging that Defendants "acted as counsel for the Company in connection with the *Baliga* Action" and negligently failed to alert Link Motion to a potential and unsettled legal argument—that Baliga lacked standing to assert derivative claims under Cayman Islands law as an ADS-holder. Compl., ¶¶ 4, 7, 57, 83.

As for supposed causation, the Complaint claims that if DLA had made the foregoing argument, this Court would not have appointed the Receiver, and the Receiver would not have caused hundreds of millions of dollars in damages. For example, China AI says this Court improperly appointed a "conflicted" Receiver who refused to perform the Link Motion's contractual obligations, and instead "transferred" Link Motion assets—including its interests in FL Mobile Jiutian Technology Co., Ltd. (the "FL Mobile Shares")—"to one of his own affiliates." Compl., ¶¶ 8–9, 81, 86. This supposedly caused Link Motion to breach a prior agreement (the "Tongfang SPA") to sell those assets to Tongfang Investment Fund Series SPC ("Tongfang"). *Id.*, ¶¶ 62, 85–86. Tongfang purportedly then obtained "an arbitration award of more than USD$390,000,000

---

[4] China AI, represented by different counsel at the time, likewise never raised the argument until 2020, more than a year after DLA withdrew. Dkt 123-1.

against the Company" in China, and Link Motion lost $180.4 million "deferred net gain" from the transaction. *Id.*, ¶¶ 8, 85–90. These allegations are false, and Plaintiff and its Counsel know it.

## V. China AI And Its Counsel Knew That Link Motion Completed The FL Mobile Transaction Well Before The *Baliga* Action Was Even Filed

Plaintiff's allegations concerning the FL Mobile Shares are expressly contradicted by publicly-filed documents and agreements, including Link Motion's SEC filings. Those documents confirm that Link Motion fulfilled its obligations with respect to the FL Mobile Shares more than a year ***before*** the *Baliga* Action was filed.

At the end of March 2017, Link Motion announced that it had agreed to sell its interests in FL Mobile and another business, Beijing Showself Technology Co., Ltd., to Tongfang. Ex. F. The Tongfang SPA provided that the FL Mobile Shares would be transferred to Tongfang upon its completion of certain payment obligations. Dkt 228-4; Ex. G at 3 ("[Link Motion] ha[s] transferred [its] equity interests in FL Mobile . . . while the purchasers still have certain period to complete their payment obligations"). Tongfang completed those payments in December 2017. Ex. H at 5. However, rather than paying all cash, Link Motion permitted Tongfang to issue a senior note to Link Motion for RMB1,770 million (the "Tongfang Note"). *Id.*; ¶ 63. The Tongfang Note was due to be paid in December 2018. Ex. H at 5.

Accordingly, on December 14, 2017, Link Motion announced that it had received "100% of the agreed upon price" for the FL Mobile Shares, that it thus "ha[d] completed the FL Mobile Divestment," and that it had reclassified FL Mobile as "discontinued operations" in the Company's consolidated financial statements. Ex. H at 4–6. In a publicly-filed February 7, 2018 letter to Link Motion shareholders, Dr. Shi also represented that "[t]he transaction completed on December 14, 2017." Ex. I at 4. And Link Motion again reported on April 11, 2018 that it had "[c]ompleted the

divestment of FL Mobile," and recorded a $180.4 million "deferred gain" that included anticipated proceeds from the Tongfang Note.[5]  Ex. J at 5; ¶ 90.

Along with the Tongfang Note in December 2017, Tongfang executed an "Equity Pledge Agreement," Ex. K at 1, which gave Link Motion **the right to retake ownership** of the FL Mobile Shares if Tongfang failed to pay the Tongfang Note.  *Id*. at 1–2; *see* Ex. L at 5 ("[U]nder the agreements . . . the Company has the ability to recover the shares it has sold to Tongfang if Tongfang fails to pay [the Note].").  In that Agreement, Tongfang **expressly represented** that the FL Mobile Shares "are held by [Tongfang]."  Ex. K at 1.  The Equity Pledge Agreement would have served no purpose if Link Motion had retained ownership of the FL Mobile Shares.  Tongfang didn't pay the Tongfang Note upon maturity in December 2018, and it remains outstanding.  Compl., ¶ 90.

## VI.     China AI And Its Counsel Knew When They Filed The Complaint Here That The Tongfang Award Was A Sham Orchestrated By Dr. Shi

On February 8, 2022, Plaintiff's Counsel finally provided Defendants with the purported Tongfang Award cited in the Complaint.  Dkt 269-1; Dkt 269 at 1 n.1.[6]  According to that document, Tongfang commenced an arbitration concerning the FL Mobile Shares in Hong Kong on April 23, 2019 (the "Tongfang Arbitration").  Significantly, that was several months **after** the Receiver had been appointed.  Dkt 269-1; *see* Compl., ¶¶ 8, 87–88.  At that time, the *Baliga* PI Order directed all defendants, including Dr. Shi, to "ensure that litigation or arbitration matters [be] directed and controlled by the Company's lawyers, the appointed Receiver, and/or the non-

---

[5]  $180.4 million actually is the "deferred gain" from *both* the sale of FL Mobile *and* another business called Showself.  Ex. J at 5.  Plaintiff concedes that the Showself transaction was fully performed.  Compl, ¶ 63.

[6]  As with China AI, Dr. Shi has significant ties to Tongfang.  *See* Dkt 220 at 4.  In response to Defendants' March 7, 2022 letter concerning their motion to dismiss, ECF 16, Plaintiff's Counsel didn't meaningfully dispute this fact, asserting only that "Baliga has conceded that Tongfang SPC was not Dr. Shi's alter ego," but citing a brief that doesn't actually contain that concession.  ECF 17 at 3.

conflicted board members as directed by the Receiver." Dkt 26 at 3. Despite the Court's clear directive, the Receiver was ***never*** notified of the Tongfang Arbitration and didn't learn of the Tongfang Award until almost two years after it issued. Dkt 269 at 1.

It gets worse. According to that Tongfang Award provided by Plaintiff's Counsel:

> [Link Motion] ha[s] not been legally represented in this arbitration. Instead, by email dated 5 May 2019 Mr. Shi confirmed to HKIAC that he was acting on behalf of [Link Motion]. [Link Motion] (through Mr. Shi) have therefore been aware of these proceedings. But [Link Motion] ha[s] opted not to submit any document in this reference.

Dkt. 269-1 at 4. Plaintiff's Counsel's client, Dr. Shi, thus blatantly violated the *Baliga* PI Order by falsely representing to the arbitrator that he alone "***was acting on behalf of the Respondents***." *Id.*; *see* Dkt. 269 at 1 ("Defendant Shi secretly arrogated to himself the authority to speak for the Company in the Tongfang Arbitration."). Even more outrageous, Dr. Shi, as confirmed by the Tongfang Award provided by Plaintiff's Counsel, refused to provide *any* defense or response to Tongfang's submissions—despite the fact that Tongfang's claim was meritless because, as discussed above, the transaction had been completed. Dkt 269-1 at 5, 7. In effect, Plaintiff's Counsel's client unlawfully and fraudulently obtained a nine-figure, bogus arbitration award that they now are alleging constitutes compensable damages against DLA.

Notably, Tongfang has never tried to enforce the sham Tongfang Award. Nor has it ever paid amounts remaining on the Tongfang Note. In fact, Tongfang's representatives in the Tongfang Arbitration told the arbitrator that Tongfang has been dissolved. Ex. M.

None of this is an innocent mistake by Plaintiff's Counsel. In a June 2021 declaration they filed in the *Baliga* Action, Dr. Shi described a "Tongfang Arbitration," claiming that "[i]n April 2019, Tongfang commenced an arbitration against the Company and me to rescind the purchases of FL Mobile and Showself." Dkt 228 at ¶ 33. Dr. Shi (and Plaintiff's Counsel) further falsely claimed, just as China AI alleges here, and as Plaintiff's Counsel argues in the state court action,

that "[a]s a result of Baliga's and the Temporary Receiver's improper and baseless interference with the Company's ability to transfer the shares to Tongfang, the arbitrator issued an award against the Company . . . in the amount of RMB 2,520,000." *Id*. at ¶ 34; *see* ¶¶ 87–88. But the award they cited and attached to that June 2021 declaration was *not* an award in favor of Tongfang *or* against Link Motion. It was from an entirely *different* arbitration that was filed in December 2018 by Zhongzhi Hi-Tech Overseas Investment, Ltd. against Dr. Shi personally completely unrelated to the FL Mobile Shares. *See* Dkt 228 at ¶ 34, 228-14.

When pressed, Plaintiff's Counsel abruptly changed course and claimed that Dr. Shi's description of a "Tongfang Arbitration" actually meant the entirely separate Zhongzhi arbitration. Dkt 246 at 20. Aware that disclosure of what Plaintiff *now* claims is the Tongfang Arbitration and Award would reveal Dr. Shi's fraudulent misconduct in violation of the Court's orders, Plaintiff's Counsel didn't disclose it—a now-too-familiar tactic by them. Plaintiff's Counsel also didn't disclose what they *now* claim is the Tongfang Award to the Receiver or this Court until they were caught and called out by the Receiver in February 2022 for their misrepresentations. Dkt 269.

## VII. China AI And Its Counsel Refused To Withdraw Their Frivolous Complaint Even After China AI's Core Standing Argument Was Rejected In The *Baliga* Action

More than two years after Defendants' offer to help Link Motion with an extension at the outset of the *Baliga* Action, Plaintiff's Counsel, on behalf of Dr. Shi, moved to dismiss that action and discharge the Receiver. Dkt 227. It was only then that Plaintiff's Counsel argued that Baliga, as an ADS-holder, lacked standing to assert common-law derivative claims under Cayman Islands Law—the entire basis for the claim against Defendants here that supposedly allowed the Receiver to be appointed. Dkt 230 at 8, 21–22; 275 at 10–11. But Magistrate Judge Freeman squarely rejected that argument on March 9, 2022, reasoning that Baliga "had standing to bring the securities-law claims" that he had initially pled derivatively in the initial complaint, and "this

afforded the Court subject-matter jurisdiction to issue the challenged [Preliminary Injunction] Order." Dkt 275 at 18, 22–30. Magistrate Judge Freeman thus concluded that the argument about whether there was standing for Baliga's derivative state-law claims didn't matter there (and for the same reason doesn't matter here): "even assuming the correctness of [Shi's (and Plaintiff's)] proposition, it would ultimately be immaterial to the outcome." *Id.* at 22 n.9. On August 25, the Court adopted Magistrate Judge Freeman's recommendations "in their entirety." Dkt. 275 at 41.

## VIII. China AI And Its Counsel Refused To Withdraw Their Complaint Even After Defendants Explained With Evidence That It Was False And Legally Frivolous

Defendants' March 7, 2022 letter (the "Rule 11 Letter") "describ[ed] the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c)(2); *see* Ex. N. Defendants set forth three independent grounds for sanctions: the Complaint (i) is premised on knowingly false allegations concerning the scope of Defendants' representation in the *Baliga* Action, the FL Mobile transaction, and the Tongfang Arbitration, in violation of Rule 11(b)(1); (ii) asserted a claim that Plaintiff and Plaintiff's Counsel know or should know has no chance of success, in violation of Rule 11(b)(2); and (iii) is plainly an improper attempt to harass Defendants and extort an unwarranted settlement, in violation of Rule 11(b)(3). Ex. N.

Copies of the Rule 11 Letter, including the notice of motion and exhibits referenced therein, were served on Plaintiff's Counsel on March 8, 2022. Ex. O. More than six months have now passed, and Plaintiff's Counsel has never responded to the Rule 11 Letter and refused until recently to withdraw the Complaint. Indeed, by separate response to Defendants' March 7, 2022 letter concerning an anticipated motion to dismiss (the "MTD Letter," ECF 16), Plaintiff and Plaintiff's counsel stubbornly refused to withdraw or amend the Complaint. ECF 17 at 4.

On August 24, 2022, Magistrate Judge Figueredo ruled that Defendants could proceed with their motion to dismiss. On September 12, 2022, days before Defendants had proposed they file

that motion, Plaintiff's Counsel abruptly filed a "Notice of Voluntary Dismissal Without Prejudice" to be approved by the Court and a letter requesting that China AI be excused from providing notice, as required under Rule 23.1. ECF 26, 27.

Without waiting for the Court to rule regarding the required notice, much less grant leave for Plaintiff to dismiss the Complaint, Plaintiff's Counsel filed a direct legal malpractice action on behalf of Link Motion, Inc. against Defendants in the Supreme Court of the State of New York. *See Link Motion Inc., v. DLA Piper LLP (US) and Caryn G. Schechtman*, Case No. 653322/2022 (N.Y. Sup. Ct.), NYSCEF No. 1 (Complaint, dated Sept. 9, 2022). The allegations in that complaint are the same as China AI and its Counsel alleged in this action. *Id.* The filing of that action violated this Court's orders in the *Baliga* Action.

## DISCUSSION

Rule 11 imposes "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing" a Complaint. *Yeremis v. Amerit Fleet Sols.*, 2021 WL 1565693, at *9 (S.D.N.Y. Apr. 21, 2021). Following such inquiry, the attorney filing a pleading certifies that the "factual contentions [therein] have evidentiary support," the legal claims are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law," and the filing is not being made "for any improper purpose, such as to harass . . . ." Fed. R. Civ. P. 11(b)(1), (2), (3). Where Rule 11 has been violated, "a district court has broad discretion to tailor appropriate and reasonable sanctions," *Edwards v. Barclays Servs. Corp.*, 2020 WL 3446870, at *5 (S.D.N.Y. June 24, 2020), including without limitation "an order directing payment . . . [of] attorney's fees and other expenses directly resulting from the violation," Fed. R. Civ. P. 11(c)(4), and dismissal of a complaint. *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *15 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009).

Plaintiff and Plaintiff's Counsel have violated Rule 11 by filing a Complaint premised on

knowingly false allegations; by asserting a claim for which they cannot establish causation or damages, which is otherwise devoid of merit, and for which Plaintiff lacks standing; and attempting to extort Defendants with bad faith threats of massive, fabricated damages. Under these circumstances, an order dismissing the Complaint with prejudice and directing Plaintiff and Plaintiff's Counsel to pay Defendants' attorney's fees, costs and other expenses, coupled with suitable findings of fact and law, is "appropriate and reasonable."

## I. CHINA AI AND ITS COUNSEL FILED A COMPLAINT PREMISED ON DEMONSTRABLY FALSE ALLEGATIONS IN VIOLATION OF RULE 11(b)(3)

"[A]t a minimum," Rule 11 requires "that there is reason to believe that, when all the facts are known, the Court will find that they support the relief requested." *Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805, 809 (S.D.N.Y. 2001); *see* Fed. R. Civ. P. 11(b)(3). In other words, "an attorney has an obligation to file only papers that have a basis in fact," *Goldman v. Barrett*, 825 F. App'x 35 (2d Cir. 2020), and cannot "simply take her client's word on faith where that word would be easily proved (or disproved) through a reasonable investigation or where red flags should have (and would have) alerted counsel to problems." *AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *11 (S.D.N.Y. Sept. 26, 2019), *aff'd*, 829 F. App'x 533 (2d Cir. 2020); *see In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114 (S.D.N.Y. 2007) (noting that "[a] baseless factual contention poses a greater threat to justice than a baseless legal contention," and granting sanctions where party made "factual contentions . . . utterly lacking in support").

Plaintiff and its Counsel knew at filing that key allegations in the Complaint were demonstrably false and misleading. And they further became aware of that fact upon receipt of Defendants' Rule 11 Letter. Their decision nevertheless to proceed with the Complaint here (and in state court) alone warrants sanctions. *Levine v. F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993)

15

("[B]latant disregard of the facts amply warrant[s] the imposition of sanctions.").

### A. Transfer Of The FL Mobile Shares Was Completed In 2017, and the Tongfang Arbitration was a Sham Manufactured by Dr. Shi

China AI's core allegation that "[a]t the time the Baliga Action was commenced, the Company was in the midst of [the Tongfang] transaction" and that "[w]hat remained to be performed under the [Tongfang] SPA was the Company's obligation to cause the transfer of FL Mobile shares." Compl, ¶¶ 61, 64. China AI and its Counsel claim that Defendants' failure to raise the argument that Baliga lacked derivative standing caused the Court to appoint the Receiver, which in turn refused to transfer the FL Mobile Shares (instead transferring those shares to an affiliate), resulting in an arbitration award against Link Motion of "USD$396,000,000." *Id.*, ¶¶ 86–88. Every aspect of those allegations is false.

### 1. The FL Mobile Transaction Indisputably Closed in December 2017

If the FL Mobile Shares were transferred to Tongfang before the Receiver was appointed, Plaintiff can't establish that the Receiver prevented that transfer, or that Defendants caused the purported Tongfang Award. As noted above, numerous public filings unambiguously confirm that the transfer of FL Mobile Shares to Tongfang was "completed" by December 14, 2017—*more than a year* before the Receiver was appointed. *See* Ex. H at 5–6, Ex. J at 5; *supra* at 8-10.

When Defendants identified this fatal infirmity in their March 7 MTD Letter, ECF 16 at 3, Plaintiff's Counsel (as with Dr. Shi's description of the Tongfang Arbitration in the *Baliga* Action, *see supra* at 10-12), backtracked and traded one falsehood for another. Abandoning their false claim that a "conflicted" Receiver "transferred FL Mobile to one of his own affiliates," Compl., ¶ 86, Plaintiff's Counsel asserted instead that the FL Mobile Shares had been held in escrow "as security for the Tongfang Note," and that the *Baliga* PI Order had merely triggered a technical breach of the Company's "obligations to hold the shares for Tongfang." ECF 17 at 3.

That explanation too is demonstrably false. The "escrow agreement" cited by Plaintiff's Counsel as supposed evidence of this new false theory is a Supplemental Agreement executed in conjunction with the Tongfang SPA in March 2017, *eight months before* there even was a "Tongfang Note." Dkt 228-4, 228-5. That Agreement provided that the FL Mobile Shares would be "entrusted" to Dr. Shi until "the Closing of the Share Purchase Transactions." Dkt 228-5 at § 2. As noted above, that unequivocally occurred in December 2017, at which point the FL Mobile Shares were transferred to Tongfang. *See* Ex. H at 5–6; Ex. K at 1–2 (acknowledging that the FL Mobile Shares "are held by [Tongfang]," and pledging those Shares as security for the Tongfang Note); Ex. L at 5 ("[U]nder the agreements . . . the Company has the ability to recover the shares it has sold to Tongfang if Tongfang fails to pay [the Tongfang Note].").

### 2. The Tongfang Arbitration (and Resulting Award) Was Plainly A Sham

The Tongfang Award provided by Plaintiff's Counsel confirms that the Tongfang Arbitration was a sham orchestrated by Dr. Shi after the Receiver was appointed and in violation of this Court's PI Order. *See* Dkt 269, 269-1. According to that document, the Tongfang Arbitration was supposedly initiated on April 23, 2019, Dkt 269-1 at 2, *months after* this Court had ordered that Dr. Shi and the other *Baliga* defendants "ensure that litigation or arbitration matters [be] directed and controlled by the Company's lawyers, the appointed Receiver, and/or the non-conflicted board members as directed by the Receiver." Dkt 26 at 3.

In violation of that Order, Dr. Shi didn't disclose the Tongfang Arbitration to the Receiver, and ***falsely represented to the arbitrator that he alone had authority to represent the Company.*** Dkt 296-1 at 4; Dkt. 269 at 1–2 (explaining that Dr. Shi "failed to notify the Receiver of the existence of [the Tongfang Arbitration]" and instead "secretly arrogated to himself the authority to speak for the Company in the Tongfang Arbitration"). Dr. Shi thereafter refused to file *any* defense or response, ensuring a windfall to an entity, Tongfang, with which he apparently has a

financial interest. Dkt 269-1 at 5, 7; *see supra* at 10-12.

Even putting aside the Tongfang Award and the Link Motion filings cited above, Plaintiff's Tongfang Arbitration allegations are nonsensical for another reason: Tongfang *never paid the Tongfang Note*, as Plaintiff concedes. It strains credulity to claim that Link Motion breached an agreement to transfer the FL Mobile Shares, when Tongfang never fulfilled its contractual obligations to *pay* for those Shares. It is unsurprising that Dr. Shi never even raised this defense with the arbitrator, as it is clear that the whole transaction was a sham concocted by Dr. Shi and Tongfang to siphon valuable assets out of the Company. What *is* surprising is that Plaintiff's Counsel are willing to go along with what is clearly a fraud on Defendants and this Court.

This isn't the first time Plaintiff has attempted to mislead the Court regarding to the Tongfang Arbitration. In the June 2021 declaration Plaintiff's Counsel filed in the *Baliga* Action, Dr. Shi falsely claimed that the "appointment of the Receiver and entry of the preliminary injunction" prevented Link Motion from transferring the FL Mobile Shares to Tongfang, and that the purpose of the so-called "Tongfang Arbitration" was to rescind that transaction. Dkt 228 at ¶¶ 32–33.[7] In "support" of this allegation, Dr. Shi attached an unrelated arbitration award in favor of a different party (Zhongzhi) against only him personally. Dkt 228-14. When challenged, Plaintiff's Counsel and Dr. Shi frantically backtracked. *See supra* at 11-12.

## B. China AI And Its Counsel Knew Defendants Were Never Retained or Engaged in the *Baliga* Action

The Complaint alleges that Defendants "undertook a new attorney client relationship with the Company" for "the defense of Baliga's derivative claims." Compl., ¶¶ 58–59. But the

---

[7] In addition to being erroneously included in the $180 million in "damages" Plaintiff alleges, the transfer of Showself to Tongfang has also been the subject of conflicting allegations from Plaintiff's Counsel. In a declaration in the *Baliga* Action, Dr. Shi claimed that the Receiver had interfered with *both* the transfer of FL Mobile and Showself, and that the Tongfang Arbitration concerned *both* transactions. Dkt 228 at ¶¶ 32–33. The Complaint, by contrast, alleges that, by the time a TRO was issued in the *Baliga* Action, "the Company had already caused the transfer of Showself to Tongfang SPC." ¶¶ 63–64.

communications cited by the Complaint and described above establish just the opposite—that for *more than a month* after Defendants initially appeared in the matter merely to obtain an extension of time for Link Motion to respond, Link Motion (and Dr. Shi on its behalf) consistently refused to engage with Defendants concerning whether they should substantively defend the *Baliga* Action or even to explain whether or how the Company wished to respond. *See supra* at 4-7.

As DLA informed the Link Motion Board in the January 14, 2019 email cited in the Complaint, "[w]e have repeatedly asked for instruction on how to proceed but have not received any guidance from the Company or the individual defendants and advised that if we do not receive payment for legal services, we cannot take on this litigation matter." Ex. D at 3 (cited at Compl. ¶ 72). DLA also warned, "[i]f we do nothing, the motion may be granted, which may include such relief as appointing a receiver over the company and a preliminary injunction restricting the Company from transferring assets." *Id.* at 2. Four days later, having again received no response, DLA added "if we do not hear back from you within 24 hours, DLA will assume that we have Link Motion's consent not to oppose the motion" and "to withdraw from representation." *Id.* at 1 (cited at ¶ 74).

Plaintiff and its Counsel suggest these emails were "too little, too late" by falsely citing "time difference and language barriers to the rendering of competent legal advice." Compl., ¶ 75. These *bilingual* emails were in fact the culmination of a *weeks-long* effort to get Link Motion to engage in any manner and respond to the *Baliga* Action, all to no avail. *See supra* at 4-7; Exs. A– E. Defendants, after initially "appear[ing] . . . in order to protect Link Motion's immediate interest in the emergency filing and to allow Link Motion the opportunity to determine whether to contest the matter," thereafter withdrew due to Link Motion's "fail[ure] to cooperate in the representation by failing to respond" to requests for guidance; "fail[ure] to pay outstanding and overdue legal

fees owed to DLA despite repeated requests to pay"; and confirmation that "it d[id] not have sufficient assets and cannot pay DLA's legal fees at this time." Dkt 28 at 6. Thus, the notion that Link Motion ever retained Defendants to substantively defend the *Baliga* Action, or that Defendants assumed some duty to do so, is plainly false.

*   *   *

In light of the above, Plaintiff and its Counsel simply couldn't have conducted "an inquiry reasonable under the circumstances" and concluded that "the factual contentions" in the Complaint "have evidentiary support." Fed. R. Civ. P. 11(b)(1); *see Colliton*, 2008 WL 4386764, at *13 ("It is clear that sanctions are appropriate where facts have been 'concocted'."). And they indisputably were aware, after receiving of Defendants' Rule 11 Letter, that key allegations in the Complaint were false. Their decision nevertheless to press forward with that Complaint warrants sanctions. *See AJ Energy*, 2019 WL 4688629, at *11 ("a court may impose sanctions on a party for refusing to withdraw an allegation or claim even after it was shown to be inaccurate"), *aff'd*, 829 F. App'x at 535–36 (affirming sanctions where "documents submitted during the litigation . . . confirmed the frivolous and fraudulent nature of AJ Energy's allegations"); *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997) (awarding sanctions where "plaintiff's counsel not only failed to make a reasonable inquiry . . . before filing the complaint, but also refused to withdraw the complaint despite clear indications that such action was warranted").

## II.   CHINA AI AND ITS COUNSEL FILED A FRIVOLOUS CLAIM WITH NO CHANCE OF SUCCESS IN VIOLATION OF RULE 11(b)(2)

Sanctions are also appropriate because it is "patently clear that [Plaintiff's] claim[s] ha[ve] absolutely no chance of success." *Binghamton Masonic Temple, Inc. v. Bares*, 168 F.R.D. 121, 126 (N.D.N.Y. 1996) (quoting *Sussman v. Bank of Isr.*, 56 F.3d 450, 457 (2d Cir. 1995)); *see* Fed. R. Civ. P. 11(b)(2) (attorney must certify that "the claims . . . are warranted by existing law").

China AI cannot establish multiple essential elements of its purported legal malpractice claim, including causation, damages, and conduct within the scope of the representation, and it lacks standing to sue derivatively under governing law. *Howard*, 977 F. Supp. at 666 (awarding sanctions where plaintiff's "causes of action are incurably defective on their face."); *Bletas v. Deluca*, 2011 WL 13130879, *11 (S.D.N.Y. Nov. 15, 2011) ("[P]laintiffs failed to undertake a reasonable inquiry into the law that governs and clearly precludes the[ir] claims.").

## A.    China AI Cannot Establish Multiple Elements Of Its Claim

China AI's reliance on demonstrably false allegations means that it cannot establish multiple elements of its legal malpractice claim. Specifically, in light of the above-described falsehoods concerning DLA's role in the *Baliga* Action, the status of the FL Mobile Shares, and the sham Tongfang Arbitration, Plaintiff cannot establish that Defendants' purported conduct (1) was within the scope of the attorney's representation; (2) was the proximate or "but-for" cause of an injury to Link Motion; and (3) directly resulted in "actual damages." *See Allegrino v. Ruskin Moscou Faltischek, P.C.*, 2021 WL 5500084, at *1 (2d Cir. Nov. 24, 2021); *see also Abbas v. Orrick, Herrington & Sutcliffe, LLP*, 2016 WL 1071033, at *6 (S.D.N.Y. Mar. 16, 2016) (concluding that a complaint was "clearly meritless" where plaintiff "fail[ed] to sufficiently allege facts to satisfy three of the four required elements" of its claim).

*First*, given that Plaintiff's allegations concerning the FL Mobile Shares are false—the FL Mobile Shares were transferred to Tongfang before the *Baliga* Action was filed and the Tongfang Arbitration was a sham orchestrated by Dr. Shi in violation of this Court's orders—Plaintiff cannot show that Defendants' "action or inaction [was] the 'but for' cause of [Link Motion's] damages." *Allegrino*, 2021 WL 5500084, at *2; *see also Schutz*, 2013 WL 3357921, at *7 (S.D.N.Y 2013) (plaintiff must show "actual and ascertainable damages"). Further, Tongfang had *already defaulted* on the Tongfang Note when the Receiver was appointed, has never paid Link Motion,

and has since been dissolved.  *See* Ex. M, *supra* at 11.  Thus, the notion that Link Motion would

ever have realized the $180 million "deferred gain" allegedly lost is speculative at best.  *See Judd*

*Burstein, P.C. v. Long*, 797 F. App'x 585, 588 (2d Cir. 2019) ("speculative" allegations "do not

give rise to a reasonable inference that any damages exist.").[8]

    *Second*, Link Motion ignored Defendants' outreach concerning the *Baliga* Action for

weeks, ultimately confirmed that it wouldn't retain Defendants, Dkt 28 at 3, and declined to file

*any* opposition to Baliga's motion.  Dkt 64 at 21 ("neither Link Motion nor Shi ever opposed the

motion leading to the Preliminary Injunction Order").  Plaintiff's assumption that Link Motion

would have "woken up" to oppose Baliga's motion had Defendants merely suggested one potential

argument, or that an opposition brief would have prevented the appointment of the Receiver, is

just the sort of "gross speculations on future events" that cannot support a claim.  *Heritage*

*Partners, LLC v. Stroock & Stroock & Lavan LLP*, 19 N.Y.S.3d 511 (2015).  Indeed, Dr. Shi had

ample opportunity to make that argument through Plaintiff's Counsel but declined to do so for

more than two years.  Further, Magistrate Judge Freeman recently affirmed that Baliga "had

standing to bring the securities-law claims . . . [which] afforded the Court subject-matter

jurisdiction to issue the challenged [Preliminary Injunction] Order."  Dkt 275 at 18.  In other words,

what Plaintiff touts as a "meritorious defense" *would not have changed the outcome*.  Dkt 275 at

22 n.9 ("[E]ven assuming the correctness of [Shi's] proposition, it would ultimately be immaterial

---

[8]  Plaintiff's only other damages-related allegations—that the Receiver has "exhausted all the Company's available cash," "incurred unnecessary liabilities," and "prevented the Company from resolving employment claims by former employees in the PRC," Compl., ¶¶ 93–94—are entirely conclusory, and "merely assume[] that the [Company] would have fared better had defendants [acted]" differently."  *Schutz*, 2013 WL 3357921. Plaintiff also fails to explain how Defendants could be liable for the Court-approved costs of a Receiver—which the Court has noted benefitted the Company—or how Defendants are responsible for the court-approved actions of the Receiver.  Dkt 275 at 37 ("the Receiver seems to have recovered substantial Company assets that were allegedly wrongfully diverted"); Dkt 64 at 21 ("Receiver was necessary to protect against 'the imminent danger of the property being lost'" in light of "the perilous situation of the Company").  In fact, the only one apparently "harmed" by the Receiver's attempts to protect the Company and its assets is Dr. Shi, making the impropriety of Plaintiff's Counsel's simultaneous representation of Dr. Shi and the Company all the more apparent.

to the outcome . . . ."); *see Flutie Bros. v. Hayes*, 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) (claimant must show that "but for the attorney's negligence, 'what would have been a favorable outcome was an unfavorable outcome.'").

*Third*, Link Motion never retained Defendants to substantively defend the *Baliga* Action. *Supra* at 4-7. An attorney cannot be liable for malpractice where, as here, the allegedly negligent conduct "fall[s] outside of the scope of the attorney's representation." *Allegrino*, 2021 WL 5500084, at *1; *see also AmBase Corp. v. Davis Polk & Wardwell*, 8 N.Y.3d 428, 435 (2007).

*Fourth*, Dr. Shi's retention of Plaintiff's Counsel after DLA withdrew from the *Baliga* Action is an intervening event that defeats causation as a matter of law. Plaintiff's Counsel learned that Baliga was an ADS-holder (and not a registered shareholder) in March 2019, *before* the Tongfang Arbitration was allegedly initiated, and yet failed to challenge his standing on that basis in its then-pending motion to dismiss and discharge the Receiver. *See* Dkt 41 at 19:15-19, Dkt 62. "It is well-settled that the introduction of new counsel serves as an intervening cause in a legal malpractice claim, severing the chain of causation . . . so long as new counsel has sufficient opportunity to protect the plaintiffs' rights." *Schutz*, 2013 WL 3357921, at *6.[9]

## B. China AI Lacks Standing Under Applicable Cayman Islands Law

China AI and its Counsel acknowledge that standing to sue on behalf of Link Motion is governed by Cayman Islands law. Compl, ¶ 95; ECF 17 at 2; *see also Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011). That law "prohibits shareholder derivative actions," subject only to a few narrow exceptions. *Shenwick v. HM Ruby Fund, L.P.*, 106 A.D.3d

---

[9] The independent conduct of both the Receiver (in allegedly failing to transfer FL Mobile) and Dr. Shi (in falsely representing that he represented Link Motion in the Tongfang Arbitration and then deliberately failing to defend Link Motion) also constitute intervening events that sever the causal chain here. *See Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP*, 552 F. App'x 79, 80 (2d Cir. 2014) (affirming dismissal where third party conduct constituted "'intervening and superseding' cause").

638, 639 (1st Dep't 2013) (emphasis added). China AI "must demonstrate that [it] meets the specific requirements of one of th[os]e well-established" exceptions "in order to have standing." *Winn v. Schafer*, 499 F. Supp. 2d 390, 397 (S.D.N.Y. 2007).

China AI and its Counsel rely on a "fraud on the minority" exception, arguing that *Baliga* had "*de facto* control" of Link Motion, committed "fraud," and somehow was aided and abetted by Defendants. ECF 17 at 2–3. But that frivolous claim is directly contradicted by the Complaint, which alleges that Baliga was associated with a group of "former stakeholders" that had "lost the contest for control" of the Company and its Board of Directors, Compl., ¶¶ 20, 30, 37; *see Winn* , 499 F. Supp. 2d at 396–97 ("[A]lleged wrongdoers must have 'control' over a majority of the stock with voting rights . . . [and] must have committed 'fraud.'"). Moreover, the Complaint—which alleges only *negligence* and thus no intentional conduct by Defendants, Compl., ¶ 112—lacks any allegation that Defendants "directly participated in or w[ere] an accessory to" *any* conduct by Baliga, let alone fraud, as required to assert a derivative claim against a third party. *Renren, Inc. v. XXX*, 2020 WL 2564684, *27 (N.Y. Sup. Ct. May 20, 2020), *aff'd sub nom. Matter of Renren, Inc*., 192 A.D.3d 539 (1st Dep't 2021).

Plaintiff's Counsel is indisputably familiar with Cayman Islands law as it pertains to derivative standing—they have been litigating it for years in the *Baliga* Action, and submitted an expert declaration on the subject to the Court. Dkt 131 at 5 (opining that under Cayman Islands law, "where a wrong has been done to a company, *prima facie* the only proper plaintiff is the company itself" and that "an action by a shareholder claiming relief for the company is not available"). Indeed, both of the cases cited in the Complaint confirm that Cayman Islands law prohibits derivative common-law claims except in very narrow circumstances. *See* Compl., ¶¶ 42, 95 (citing *Winn*, 499 F. Supp. 2d 390 and *Howe*, 783 F. Supp. 2d 466). In light of that well-settled law, Plaintiff's Counsel's refusal to withdraw the Complaint, and decision instead to "double

down" with a frivolous argument that contradicts Plaintiff's own pleadings, is sanctionable. *Bletas*, 2011 WL 13130879, *11 ("Nor is it necessary to decide whether plaintiffs' failure to ascertain that all of these claims are foreclosed by well-established law was objectively unreasonable at the time they first brought suit because after receiving notice that [defendants] intended to seek sanctions . . . plaintiffs chose to double down on their allegations . . . .").

## III. CHINA AI AND ITS COUNSEL FILED THE COMPLAINT FOR AN IMPROPER PURPOSE IN VIOLATION OF RULE 11(b)(1)

In light of the blatant misrepresentation and patently deficient legal argument discussed above, the only reasonable inference is that China AI and its Counsel are maintaining this action (and now the NY state court action) to harass Defendants, threatening significant reputational harm and a fabricated nine-figure damages number to extort an unwarranted settlement. *See O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990) ("[C]ontinuing to press an obviously meritless lawsuit does tend to indicate bad faith and further supports the imposition of a rule 11 sanction."); *Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*, 1998 WL 410958, at *7 (S.D.N.Y. July 22, 1998) ("[T]he total lack of substance in the fraud claim, the unsubstantiated accusations . . . and the egregious and unjustified neglect to the 'reasonable inquiry requirement of Rule 11 give rise to the inference that the action was filed for improper purposes.").

## CONCLUSION

For the reasons set forth above, the Court should sanction China AI and its Counsel by making appropriate findings of fact and conclusions of law consistent with the foregoing, by directing Plaintiff and its counsel to pay Defendants' reasonable costs and fees incurred in defending this action, and by dismissing the case with prejudice as to China AI.

Dated:   September 26, 2022       GIBSON, DUNN & CRUTCHER LLP
         New York, New York

                                  /s/  Kevin S. Rosen
                                  Kevin S. Rosen
                                  333 South Grand Avenue
                                  Los Angeles, CA 90071
                                  Telephone:  213-229-7635
                                  Email:  krosen@gibsondunn.com

                                  *Attorney for Defendants DLA Piper LLP
                                  (US) and Caryn G. Schechtman*