**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHINA AI CAPITAL LIMITED, a British Virgin
Islands limited company, derivatively on behalf of
LINK MOTION INC., a Cayman Islands limited
company f/k/a NQ MOBILE INC.,

              Plaintiff,

         -against-

DLA PIPER LLP (US), a Maryland limited
liability partnership, and CARYN G.
SCHECHTMAN, a natural person,

              Defendants,

         -and-

LINK MOTION INC., a Cayman Islands limited
company f/k/a NQ MOBILE INC,

              Nominal Defendant.

Civil Action No.: 1:21-cv-10911-VM-VF

**DECLARATION OF MICHAEL JAMES MALONEY IN OPPOSITION
TO MOTION FOR SANCTIONS**

TABLE OF CONTENTS

I.        Plaintiff's factual contentions have evidentiary support..........................................6

   A.   Defendants represented Link Motion in the *Baliga* Action. ........................................7

   B.   The Tongfang Transaction Was Never Fully Completed. ...............................................9

   C.   In December 2018, Link Motion still had obligations to fulfill in connection with the Tongfang transaction..................................................................................................19

   D.   The Tongfang Award is not a "sham," the record suggests that the Receiver did have notice of that arbitration, and there was no complete defense to Tongfang's claim. ...20

II.       Plaintiff's damages theory is not speculative.........................................................30

III.      The Court's rulings in the *Baliga* Action do not bar this claim for malpractice....32

IV.       Plaintiff has standing to sue derivatively. ..............................................................34

V.        Plaintiff's claim was not brought for any improper purpose. ...............................35

EXHIBIT LIST

No.  Description

01  20181213 - *Baliga* Action Dkt 1 - Verified Shareholder Derivative Complaint (copy)

02  20181214 - *Baliga* Action Dkt 7 - Temporary Restraining Order

03  20181221 - *Baliga* Action Dkt 20 - Joint letter

04  20190121 - *Baliga* Action Dkt 22 - Stipulation of Non-Opposition to a Preliminary Injunction and Consent Order to Extend Time to Answer

05  20190201 - *Baliga* Action Dkt 26 - Order granting prelim injunction and appointing temp receiver

06  Excerpt of Docket Sheet from *Baliga* Action

07  20190301 - *Baliga* Action Dkt 28 - Endorsed Letter to permit DLA withdrawal with accompanying declaration of Caryn Schechtman

08  Excerpt of LKM 2016 Form 20-F Annual Report

09  20170330 - FL Mobile Share Purchase Agreement

10  20170331 - Supplemental Agreement

11  Compilation of LKM Form 6-K S.E.C. disclosures re the Tongfang transaction

12  Translation of FL Mobile share ownership information

13  2017214 - Senior Notes Instrument from Tongfang to Link Motion

14  20180410 - Form 6-K disclosure re LKM December 2017 financial results

15  20190221 - Hong Kong Affirmation of Receiver Robert W. Seiden

16  20190417 - *Baliga* Action Dkt 43 - Letter from Receiver

17  20200319 - Tongfang v Link Motion Final Award HKIAC A19086

18  20190823 - Zhongzhi v. Shi Final Award  A18222

19  20210216 - *Baliga* Action Dkt 210-1 Final Award ZZ v Link Motion

20  Compilation of Materials Publicizing TRO and PI

21  Excerpt of Cayman Islands Companies Law (2020 Revision)

22      Translation of Xingjian NQ share ownership information

23      20201023 - *Baliga* Action Dkt 175 - Memo Endorsement from Judge (copy)

24      20210611 - *Baliga* Action Dkt 227 - Notice of Renewed Motion to Dissolve Preliminary Injunction

25      20220825 - *Baliga* Action Dkt 331 - Order re R-R re Receiver

26      20200504 - *Baliga* Action DI 142-2 - Shareholder Register

27      20220314 - *Baliga* Action Dkt 17-1 - Ex A Top jet

28      0180910 - Form 6-K S.E.C. disclosure re Board Investigation

29      20180828 - Minutes of LKM board meeting

30      20180907 - Minutes of LKM Board meeting

31      20200529 - *Baliga* Action Dkt 155 - Declaration of Hua Jingyuan

32      20200529 - *Baliga* Action Dkt 155-01 - Ex. A to Declaration of Hua Jingyuan

33      20200529 - *Baliga* Action Dkt 155-02 - Ex. B to Declaration of Hua Jingyuan

34      20200529 - *Baliga* Action Dkt 155-03 - Ex. C to Declaration of Hua Jingyuan

35      20200529 - *Baliga* Action Dkt 155-04 - Ex. D to Declaration of Hua Jingyuan

36      20200529 - *Baliga* Action Dkt 155-05 - Ex. E to Declaration of Hua Jingyuan

37      20200529 - *Baliga* Action Dkt 155-06 - Ex. F to Declaration of Hua Jingyuan

38      20180718 - Minutes of LKM board meeting

39      20190611 - *Baliga* Action Dkt 64 - Decision and Order

40      20190329 - *Baliga* Action Transcript of Proceedings from Baliga Action

41      Hong Kong Interim Injunction Prohibiting Disposal of Assets

42      20200326 - *Baliga* Action DI 131 – Pearson Declaration

43      202200120 - Cayman Islands Affirmation of Receiver

MICHAEL JAMES MALONEY declares, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney duly admitted to practice law before the United States District Court for the Southern District of New York. I am a partner of Felicello Law P.C. and counsel of record for Plaintiff China AI Capital Limited ("**China AI**" or "**Plaintiff**").

2.      Plaintiff is a registered shareholder of Link Motion, Inc. f/k/a NQ Mobile Inc. ("**Link Motion**" or the "**Company**"), a Cayman Islands limited company. In this action, Plaintiff filed a Verified Shareholder Derivative Complaint on December 20, 2021 (the "**Complaint**"). Dkt. 1[1] In the Complaint, Plaintiff asserts one cause of action for legal malpractice against the Defendants DLA Piper LLP (US) ("**DLA**") and Caryn Schechtman (together with DLA, the "**Defendants**").

3.      The basis for the legal malpractice claim was Defendants' representation of Link Motion Inc. (Link Motion") in the action *Baliga v. Link Motion Inc., et al.*, Case No. 1:18-cv-11642-VM (S.D.N.Y.) (the "***Baliga* Action**").

4.      The plaintiff in the *Baliga* Action ("**Baliga**") asserted derivative claims against Link Motion and certain of its directors for breach of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 20 of the Securities and Exchange Act of 1934. **Ex. 1**. Baliga also requested appointment of a receiver for Link Motion and moved by order to show cause for appointment of a receiver and entry of a preliminary injunction on the same day the complaint was filed.

5.      Based on the lack of opposition from Defendants, the Court entered a temporary restraining order (the "**TRO**") in the *Baliga* Action on December 14, 2018. **Ex. 2**. After Defendants consented to an extension of the TRO in a "Joint Letter," **Ex. 3**, and signed a "Stipulation of Non-

---

[1] Unless stated otherwise, all references to "Dkt. [_]" refer to docket numbers in this action and all references to "Ex. [_]" refer to exhibits to this declaration.

Opposition," **Ex. 4**, the Court entered a preliminary injunction against Link Motion and appointed a temporary receiver. **Ex. 5**. Baliga's original securities claims were dismissed without prejudice for failure to allege a purchase and sale of securities in connection with the purported misrepresentations alleged in this original complaint. **Ex. 39**. Baliga later voluntarily withdrew all of his derivative claims after filing of an opinion from Cayman Islands counsel, **Ex. 42,** finding that he lacked standing to sue derivatively under Cayman Islands law.

6.      In this action, Plaintiff alleges that Defendants committed legal malpractice by failing to assert defenses and argument in opposition the motion by Baliga for a TRO, preliminary injunction, and receiver. Dkt. 1; Ex. 1.

7.      I make this declaration in opposition to the motion by Defendants for sanctions pursuant to Fed. R. Civ. P. Rule 11(b)(1), (b)(2), and (b)(3). Dkt. 35.

## I.      Plaintiff's factual contentions have evidentiary support.

8.      Defendants identify four grounds for their position that Plaintiff's factual contentions have no evidentiary support. Specifically, Defendants assert:

   a.   that Plaintiff's allegation of an attorney-client relationship lacks evidentiary support because Defendants never represented Link Motion in the *Baliga* Action;

   b.   that Plaintiff's allegation of damage from the Tongfang [2] transaction lacks evidentiary support because the transaction with Tongfang was "completed" in December 2017 long before the *Baliga* Action was filed;

   c.   that Plaintiff's allegations that entry of the preliminary injunction and appointment of the Receiver in the *Baliga* Action prevented Link Motion from completing the

---

[2] "Tongfang" refers to Tongfang Investment Series SPC, a Cayman Islands segregated portfolio company. The "Tongfang transaction" refers to the transaction between Tongfang and Link Motion regarding the purchase and sale of FL Mobile Jiutian Technology Co., Ltd. ("**FL Mobile**"). FL Mobile Chinese company that developed mobile applications and was formerly a consolidated affiliate of Link Motion.

Tongfang transaction lack evidentiary support because "there were no obligations left to fulfill" by the Receiver at the time of his appointment; and

d.   that "the Tongfang Award is a sham, orchestrated by Dr. Shi" and that the Receiver was "never notified of the Tongfang Arbitration," suggesting that if the Receiver had been, he would have been able to provide a complete defense to the claims.

Dkt. 35 at 3-8. *See also* Dkt. 36 at 4-7, 8-12, 15-20.

9.     Each of Defendants' assertions are incorrect and Plaintiff's allegations of fact are well supported by evidence as follows.

**A.     Defendants represented Link Motion in the *Baliga* Action.**

10.    On this motion, Defendants contend that an attorney-client relationship never existed between them and Link Motion sufficient to support a claim for legal malpractice. Specifically, Defendants contend that "DLA was never engaged and never agreed to undertake the defense of the *Baliga* Action." Dkt. 35 at 7.

11.    The existence of an attorney client relationship between Link Motion and the Defendants is found in the record of the *Baliga* Action.

12.    First, as reflected in **Ex. C** (Dkt. 37-3) to the Hart Decl.,[3] DLA sent an attorney to appear in court on December 14, 2018 on behalf of Link Motion. Hart Decl. **Ex. C** at 1.

13.    Second, Defendants signed a December 21, 2018 "Joint Letter" on behalf of Link Motion. In the Joint Letter, Defendants consented—on behalf of Link Motion—to an extension of the TRO entered by the Court on December 14, 2018. **Ex. 3**. The Joint Letter was filed with Defendants' consent in the *Baliga* Action at Dkt. 20. Defendants signed the letter as "Counsel for Defendant, Link Motion Inc." **Ex. 3** at p.2.

---

[3] The "Hart Decl." refers to the Declaration of Nancy Hart, dated September 26, 2022 (Dkt. 37).

14.     Third, Defendants signed a January 21, 2019 "Stipulation of Non-Opposition" in their capacity as "Counsel for Defendant Link Motion Inc." **Ex. 4** at pp.1, 3. In the Stipulation of Non-Opposition, Defendants consented to entry of the preliminary injunction and appointment of the Receiver. Defendants again signed as "Counsel for Defendant Link Motion Inc." **Ex. 4** at 3.

15.     Fourth, the "Stipulation of Non-Opposition" signed by Defendants was filed by Marc Silverman, an associate at DLA. *See* https://www.dlapiper.com/en/us/people/s/silverman-marc-a/. Annexed here as **Ex. 6** is a true and correct excerpt of the docket from the *Baliga* Action; docket entry 22 reflects that Mr. Silverman filed the Stipulation.

16.     Finally, in paragraph 1 of a March 1, 2019 declaration signed by Ms. Schechtman, **Ex. 7**, she states "I am a partner at DLA Piper LLP (US) ("DLA"), which has represented and appeared in this matter on behalf of Link Motion Inc. (f/k/a NQ Mobile Inc.) ("Link Motion" or "Defendant"). My colleague Marc A. Silverman and I have appeared as counsel for Link Motion during this litigation." **Ex. 7** ¶1.

17.     In paragraph 2 of her declaration, Ms. Schechtman notes that Link Motion was behind on bills it owed to DLA. **Ex. 7** ¶2.  In paragraph 3 of her declaration, Ms. Schechtman states that "[n]otwithstanding [the failure to pay outstanding invoices], at Link Motion's request, DLA appeared in this action after the Plaintiff filed its Complaint and OSC in order to protect Link Motion's immediate interest in the emergency filing and to allow Link Motion the opportunity to determine whether to contest the matter." **Ex. 7** ¶3.

18.     Thus, Plaintiff submits that its allegation of an attorney-client relationship between Defendants and Link Motion is well supported by the evidence and that Defendants did undertake to represent Link Motion in the *Baliga* Action specifically with respect to the motion by Baliga for entry of a preliminary injunction and appointment of a receiver.

19.     Plaintiff further submits that the evidence supports its contention that Defendants' representation fell below the requisite standard. The evidence supporting this contention includes the email communications between Defendants and Link Motion in December 2018 and January 2019. *See* Hart Decl. **Ex. A** (Dkt. 37-1), **Ex. C** (Dkt. 37-3), **Ex. D** (Dkt. 37-4), and **Ex. E** (Dkt 37-5). Based on these email communications, independent investigation, and review of other records from the *Baliga* Action, I concluded that: (1) Defendants failed to advise Link Motion of any defenses to the application for a TRO, preliminary injunction, and receiver, (2) Defendants appeared on behalf of Link Motion at the December 14, 2018 hearing on the TRO but presented no opposition to the TRO, (3) Defendants failed to advise Link Motion of the risks of entry of a preliminary injunction and appointment of a receiver, (4) Defendants failed to obtain informed consent of Link Motion to extension to the TRO, and (5) Defendants failed to obtain informed consent of Link Motion to not oppose entry of the preliminary injunction and appointment of the receiver.

**B.      The Tongfang Transaction Was Never Fully Completed.**

20.     Link Motion first decided to divest FL Mobile,[4] Showself, and several other legacy business segments in 2015. **Ex. 8** at ECF pp.11-12. Link Motion struggled to find a buyer willing and able to purchase FL Mobile and Showself. *See* **Ex. 8** at ECF pp.11-12.

21.     In March 2017, Link Motion entered into an agreement with Tongfang to purchase FL Mobile and Showself. *See* **Ex. 8** at ECF pp.11-12. The transaction between Tongfang and Link Motion involved the sale of 63% of the equity interests in FL Mobile, Link Motion's entire holdings in FL Mobile. *Id.*

---

[4] FL Mobile Jiutian Technology Co., Ltd. ("**FL Mobile**"). FL Mobile was a Chinese company that developed mobile applications.

22.     Based on my review of the relevant documents and facts, I concluded that the Tongfang transaction occurred in two phases. The second phase of the transaction was not complete at the time that the Receiver was appointed.

23.     Defendants claim in their motion that the entire Tongfang transaction was fully completed as of December 17, 2017. That is inaccurate, as explained below. Defendants point to press releases filed with the S.E.C. claiming the transaction was completed. But the references to "completion" of the Tongfang transaction in the press releases reflect the fact that Link Motion deconsolidated FL Mobile's and Showself's financial results from its balance sheet as of December 2017 as a result of the execution of the Note and the Pledge Agreement (*see infra*). For a public company such as Link Motion, deconsolidation was significant event requiring disclosure to the S.E.C. But the transaction concerning FL Mobile continued because the Note was not due until December 29, 2018 and Link Motion maintained a security interest in the shares of FL Mobile throughout the term of the Note.

*Phase I of the Tongfang Transaction*

24.     In the first phase, Link Motion and one of its affiliates, Xinjiang NQ Mobile Venture Capital Investment, Co., Ltd. ("**Xinjiang NQ**"), executed a Share Purchase Agreement with Tongfang on or about March 30, 2017 (the "**SPA**"). **Ex 9**.

25.     To understand the terms of the SPA, it is helpful to understand the relationship between Link Motion, Xinjiang NQ, and FL Mobile.

26.     Xinjiang NQ was a necessary party because Link Motion does not own FL Mobile directly. **Ex. 9**. It owns FL Mobile through a "VIE" corporate structure, where a wholly owned subsidiary of Link Motion, NQ Mobile (Beijing) Co., Ltd., controls the equity of Xinjiang NQ, which owned the 63% equity interest in FL Mobile that was to be sold to Tongfang. **Ex. 9**. The

"VIE" corporate structure allows public companies to consolidate onto their balance sheets the assets of Chinese companies that, because of Chinese regulations, cannot be owned directly by non-Chinese persons. **Ex. 8** at ECF p.6,12,18.

27.    The SPA described the relationship between Link Motion, Xinjiang NQ, and FL Mobile as follows:

> [Link Motion] holds 100% equity interests in NQ International Limited, a Hong Kong company, which in turn holds 100% equity interests in NQ Mobile (Beijing) Co., Ltd. . . ., a company organized under the laws of the PRC. NQ Mobile (Beijing) Co., Ltd. controls Beijing NQ Technology Co., Ltd. . . . through a series of contractual arrangements (such arrangements is referred to as "NQ Control Documents" in this Agreement), and Beijing NQ Technology Co., Ltd. holds 100% equity interests in [Xinjiang NQ].

**Ex. 9** at p.1

28.    In the SPA, Link Motion agreed to cause Xinjiang NQ to sell its shares of FL Mobile to Tongfang in exchange for consideration of "RMB2,520 million." *See* **Ex. 9** at p.2 (defining the term "Company" as FL Mobile) and **Ex. 9** at p.6 § 2.1  ("RMB" refers to Chinese Renminbi currency).

29.    Section 2.3 of the SPA set forth the initial timing of the closing of the transaction. Tongfang was required to make an initial payment of RMB645 million to Link Motion "within fifteen Business Days after the date hereof." **Ex. 9** at p.6 §2.3(a)(i). Tongfang was also required to "pay RMB 1,875 million to Selling Shareholder [*i.e.*, Link Motion] on or prior to May 31, 2017." **Ex. 9** at p.6 § 2.3(a)(ii).[5]

---

[5] Because Tongfang was purchasing both FL Mobile and Showself, the SPA provided that the purchase of FL Mobile was conditioned upon transfer of the shares Showself and certain documents related to the purchase of that affiliate. **Ex. 9** at p.6 § 2.3(b).

30.     On or about March 31, 2017, Tongfang, Link Motion, Xinjiang NQ, Dr. Shi, and other affiliates of Link Motion executed a Supplemental Agreement in connection with the purchase and sale of FL Mobile (the "**Supplemental Agreement**").[6] **Ex. 10**.

31.     The Supplemental Agreement provided for an escrow-like arrangement for the FL Mobile shares until Tongfang paid in full. **Ex. 10** at 3, Art. 2. Article 2 of the Supplemental Agreement is entitled "Shareholding Entrustment" and sets forth terms by which Dr. Shi would hold shares of FL Mobile in trust pending the payment by Tongfang to Link Motion of the amounts due under the Share Purchase Agreement. **Ex. 10** at 3, Art. 2. During the period of "entrustment," Dr. Shi was bound to follow the instruction of Link Motion with respect to the shares. **Ex. 10** at 3, Art. 2.

32.     Section 2.1 of the Supplemental Agreement stated that Link Motion (referred to as "NQ") "has hereby agreed to entrust SHI Wenyong to hold its legal shares in FL Mobile and Showself (the 'Entrusted Shares') before the Closing of the Share Purchase Transactions." **Ex. 10** at p.3 §2.1.

33.     Section 2.3 of the Supplemental Agreement provided that "[a]s the nominated shareholder by NQ, SHI Wenyong shall follow the instructions from NQ (or the Purchaser [Tongfang] after the Closing of the Share Purchase Transactions, if properly) to exercise the shareholder's rights of the Entrusted Shares." **Ex. 10** at p.3 § 2.3.

34.     Section 1.2(g) defined the "Closing of the Share Purchase Transactions" as "the date when the Purchaser completes all its payment obligations as provided in the FL Mobile [Share Purchase Agreement]. . . ." **Ex. 10** at p.3 § 1.2(g).

---

[6] The Supplemental Agreement referenced the SPA in "Whereas" clause (A) as one of two "Share Purchase Transactions" between Link Motion and Tongfang, **Ex. 10** at p.1.

35.     Section 4.2 of the Supplemental Agreement modified the closing date previously agreed to in the SPA. Section 4.2 states that the "Purchaser . . . shall pay the aggregate purchase price of the Share Purchase Transactions as provided in the FL Mobile [SPA] and Beijing Showself SPA to NQ no later than [February  ], 2018." **Ex. 10** at p.3 § 4.2.

36.     The share "entrustment" created by the Supplemental Agreement is similar to the "VIE" corporate structure that exists under the NQ Control Documents and by which Link Motion exerted control over Xinjiang NQ. **Ex. 10** at 3, Art. 2; **Ex. 8** at ECF p.6, 12, 18. Based on my review of the documents and case law, "VIE" refers to "variable interest entity," a term defined in FASB 810, which governs the consolidation or deconsolidation of the financial results of entities that are not directly owned by reporting companies. **Ex. 8** at ECF p.6, 18. For example, Dr. Shi also acted as a nominee holder of shares of Beijing NQ Technology Co., Ltd (one of the entities referenced in the first "Whereas" clause of the SPA) and acted in that capacity since Link Motion's initial public offering in 2014 under the "NQ Control Documents."[7] **Ex. 8** at ECF p.18. This arrangement allowed Link Motion to consolidate onto its corporate books all of the assets and financial results of Beijing NQ Technology Co., Ltd and its subsidiaries. **Ex. 8** at ECF p.6, 12, 18.

37.     With respect to the Tongfang transaction, Link Motion's S.E.C. filings stated that Tongfang paid the initial deposit required under the SPA. *See* **Ex. 11** at ECF p.7.

38.     Publicly available data from China shows that 63% of the equity of FL Mobile was transferred to Dr. Shi as required by the Supplemental Agreement. In China, the ownership of shares of private companies is a matter of public record. Websites like Quichacha.com ("**QCC.com**") provide search capability of public records regarding share ownership. A search on QCC.com for FL Mobile (北京飞流九天科技有限公司), shows that 63% of the shares of FL

---

[7] Following appointment of the Receiver, however, controlling ownership of shares of Link Motions' Chinese affiliates were transferred to Lilin "Francis" Guo and Guo Lingyun.

Mobile were transferred to Dr. Shi's name on or about March 31, 2017 (*i.e.*, when the Supplemental Agreement was executed) but that these shares were never transferred to Tongfang.[8] **Ex. 12**. This is consistent with the terms of the SPA and Supplemental Agreement, by which Dr. Shi held the shares in trust until the completion of the sale to Tongfang. *See* **Ex. 10** at 3, Art. 2.

39.   Link Motion press releases disclosed that, in May 2017, Tongfang requested an extension of time to pay the amounts owed to Link Motion under the SPA. A press release filed with the S.E.C. on or about May 31, 2017 states that "Link Motion was notified by Tongfang Investment Fund Series SPC (the 'Purchaser') that additional time is needed for making the payment of the remaining purchase price for the sale of FLMobile Jiutian Technology Co., Ltd. and Beijing Showself Technology Co., Ltd (the 'Transactions')." **Ex. 11** at ECF p.16.

40.   Link Motion agreed to Tongfang's request for an extension of time to complete payment for FL Mobile. *See* **Ex. 11** at ECF p.16. In a press release filed with the S.E.C. under form 6-K on or about November 9, 2017, Link Motion reported that it had received payments totaling RMB950 million for the FL Mobile and Showself transactions with Tongfang. **Ex. 11** at ECF p.17. Link Motion further reported that Tongfang "remains committed to completing the entire divestments" and "is making final preparations for completing these divestments and Link Motion is working with the Investor [*i.e.*, Tongfang] to ensure this occurs as soon as possible."

41.   In December 2017, Link Motion decided to accept a promissory note from Tongfang in payment of the balance due under the SPA (the "**Note**"). *See* **Ex. 11** at ECF p.19. The December 14, 2017 press release states that "[t]he Company today received additional approximately RMB1.97 billion of consideration for the transaction, consisting of approximately

---

[8] It is our understanding that public shareholder records reflect the title owner of shares by individual shareholders or corporate parents, but do not reflect the effect of VIE or trust arrangements such as that created by the Supplemental Agreement.

RMB200 million, in cash and **RMB1,770 million in a senior note from Tongfang**." **Ex. 11** at ECF p.19 (emphasis added) (RMB1,770 million was equivalent to approximately USD$270 million at the time).

42.     The Note given by Tongfang was executed as of December 14, 2017 and provides for a one-year term with a 15-day grace period. **Ex. 13** at p.9 §1.3, at p.10 §4.1(a). Accordingly, the balance of the Note did not become finally due until **December 29, 2018**.

43.     The Note also granted to Link Motion a continuing security interest in the equity interests of FL Mobile. **Ex. 13** at p.1 "WHEREAS" clause defining "Assets" and p.11 § 6.1.[9]

44.     The security interest in FL Mobile was effected by a pledge agreement between Link Motion and Tongfang and memorialized in a Memorandum on Equity Pledge Agreement (the "**Pledge Agreement**") executed on December 14, 2017. A copy of the Pledge Agreement is annexed to the Notice of Motion as "Exhibit B" to Defendants' letter of March 7, 2022 (Dkt. 37-14).

45.     The Pledge Agreement refers to the Note and provides that Tongfang pledged to Link Motion the equity interests of FL Mobile and Showself as security for the obligation by Tongfang to pay in full under the Note. Dkt. 37-4, Hart Dec. Ex. B, at p.1 "Whereas" clause, p.2 §§ 1.1, 1.2, 1.3.

46.     The Pledge Agreement further provides that during the term of the pledge, FL Mobile would not distribute any profits to Tongfang, and no equity of FL Mobile could be transferred without Link Motion's consent. Dkt. 37-4, Hart Dec. Ex. B, at p.3 § 2.2, 2.3.

47.     When Link Motion accepted the Note and Pledge Agreement from Tongfang, the 63% equity interest in FL Mobile remained in trust under Dr. Shi's name pursuant to the terms of

---

[9] The Note provided that it would be governed by, and construed in accordance with, Hong Kong laws and all disputes would be resolved in the courts of Hong Kong. Ex. 13 at p.5 § 15.2.

the Supplemental Agreement. *See* Dkt. 37-4, Hart Dec. Ex. B, at p.1 "Whereas" clause ("Both the Target Assets and Pledged Equity are held by Party B . . . through contractual arrangements."). The "contractual arrangements" referred to in the Pledge is the Supplemental Agreement executed by Link Motion, Tongfang, and Dr. Shi.

48.     The execution of the Note and Pledge Agreement constituted the completion of what I refer to as Phase I of the Tongfang transaction. The "completion" of Phase I of the Tongfang transaction was reported by Link Motion in press releases, several of which are cited by Defendants. *See* Hart Decl. **Ex. H**.

49.     As summarized above, the references to "completion" of the Tongfang transaction in the press releases cited by Defendants refer to the fact that, because of the execution of the Note and the Pledge agreement in December 2017, Link Motion "deconsolidated" FL Mobile's and Showself's financial results from Link Motion's balance sheet.

50.     As reported in **Ex. 14**,[10] the financial results of FL Mobile "were deconsolidated as of December 14, 2017." **Ex. 14** at ECF p.3. The "deconsolidation" reflects that Link Motion exchanged its interest in and control over 64% of the equity interests in FL Mobile for the Note and Pledge Agreement. The balance sheet reported in **Ex. 14** also shows a decrease of "Assets held for sale classified as current assets" and an increase in "Notes receivable," which reflects that the value of FL Mobile to Link Motion was converted into the Note payable by Tongfang. **Ex. 14** at ECF p.12.

51.     **Ex. 14** also noted that Link Motion expected to receive future payments on the Note. **Ex. 14** refers to "**note receivable of \$270.9 million from the Q4 2017 divestment of FL**

---

[10] Report filed with the S.E.C. under form 6-K on or about April 10, 2018.

Mobile and sale of Showself." **Ex. 14** at p.1 (third bullet point under "Fourth Quarter and Full Year 2017 Financial Highlights") (emphasis added).

52.    **Ex. 14** reflects the fact that the Tongfang transaction was not yet fully paid in full. As Link Motion reported, "[t]he Company recognized $161.5 million of gain in the fourth quarter **and booked $180.4 million as deferred gain** from the disposal of discontinued operations *to be recognized when the receivables from purchasers are collected in future periods.*" **Ex. 14** at p.6 (emphasis added).

53.    Accordingly, the execution of the Note and Pledge in December 2017 resulted in the deconsolidation of FL Mobile from Link Motion's books, but the transaction was not yet fully complete because the Note remained unpaid payment was not due in full until December 29, 2018. Also, Link Motion continued to hold a security interest in and control rights over 63% of the equity of FL Mobile until the Note was paid in full. *See* **Ex. 10, 13**; **Dkt. 37-11** (Hart Decl.) at **Ex. K**.

54.    Based on my review of the records, I concluded that deconsolidation of FL Mobile resulted in a substantial benefit to Link Motion. Financial statements report that FL Mobile was reporting net losses before deconsolidation. **Ex. 14** at ECF p.6 (reporting total fourth quarter "net loss attributable to Link Motion" of "$13.2 million" and deferred gain of $180.4 million, *i.e.*, concerning Link Motion's interest in FL Mobile's results before deconsolidation). After deconsolidation, the quarterly losses of FL Mobile were no longer reported as losses of Link Motion and Link Motion was able to report the Note as a new asset of substantial fixed value. **Ex. 14** at ECF p.14.

### *Phase II of the Tongfang Transaction*

55.    In December 2017, the Note and Pledge Agreement became valuable assets of Link Motion, and FL Mobile ceased to be a consolidated operating segment on Link Motion's books.

Based on the figures provided in **Ex. 14**, the value to Link Motion of the Note and Pledge Agreement was approximately $270.8 million and Link Motion expected to realize a net gain $180.4 million upon payment in full at the end of December 2018.

56.     Based on my review of the records, I deemed this point in time as the beginning of Phase II of the Tongfang transaction. This phase of the transaction would be "completed" only if the Note was paid in full on or before December 29, 2018, Link Motion's security interest in the FL Mobile shares was extinguished, and the 63% equity interest in FL Mobile held in trust was finally released to Tongfang.

57.     Based on my investigation of the available evidence, the Note was never paid in full on December 29, 2018, the security interest in FL Mobile was not extinguished, and the 63% equity interest in FL Mobile held in trust were not transferred to Tongfang.

58.     This conclusion is supported by the statements made by the Receiver to this Court and the Hong Kong court, relevant arbitration awards, as set forth *infra*, and other records and evidence that I reviewed.

59.     First, the Receiver states, in an affirmation submitted to the Hong Kong court, dated February 21, 2019, that "[a]s of the date of this Affirmation, **the Note remains unpaid**." (emphasis added). **Ex. 15** at ¶30. The Receiver reasserted his various allegations against Dr. Shi (which Dr. Shi denies). In paragraphs 28 through 34 of the Receiver's Hong Kong Affirmation, the Receiver discussed the Tongfang Transaction and Note. **Ex. 15** at ¶¶ 28-34. In paragraph 30, the Receiver referenced the December 14, 2017 Note from Tongfang and that fact that it "**was due to be paid one year from the date it was issued**" (*i.e.*, December 2018). **Ex. 15** at ¶30 (emphasis added).

60.     Second, in a letter dated April 16, 2019 and filed with this Court in the *Baliga* Action, the Receiver stated that he had issued a demand to Tongfang under the Note, indicating that the Receiver believed that the Note had not been paid as of April 16, 2019. **Ex. 16** at ECF p.2 ¶ 4.

61.     Further, the evidence shows that the 63% equity interest in FL Mobile held in trust was not transferred out of the trust arrangement created by the Supplemental Agreement. **Ex. 12**.

62.     Under the Supplemental Agreement, Dr. Shi could only transfer these shares upon receipt of valid instructions from Link Motion. But after the Receiver was appointed, no instructions were issued. Thus, the shares remained in trust under the Supplemental Agreement.

63.     Based on the foregoing evidence, the second phase of the Tongfang transaction (*i.e.*, the transfer of shares in exchange for payment under the Note) was never completed.

### C.     In December 2018, Link Motion still had obligations to fulfill in connection with the Tongfang transaction.

64.     In their notice of motion, Defendants contend that there is no evidence to show that Link Motion had any further obligations with respect to the Tongfang transaction as of December 14, 2018, when the TRO was entered or as of December 21, 2018, when Defendants consented to the extension of the TRO. This is not accurate.

65.     As set forth above, the Note and Pledge Agreement were still outstanding as of December 14, 2018 and, based on my review of these documents and other evidence, Link Motion had outstanding obligations under these instruments.

66.     Based on my review of the Note and the Pledge Agreement, I concluded that Link Motion had an obligation to cancel the Note and terminate its security interest in the FL Mobile shares and release these shares to Tongfang upon payment in full of the Note. **Ex. 13** at 9 § 2; Ex. B.

67.     Under the Supplemental Agreement, Link Motion had an obligation to instruct Dr. Shi to "deliver[] to" Tongfang the shares of Fl Mobile "upon such Closing or other time agreed by the Parties." **Ex. 10** at 3 § 2.2.

68.     Accordingly, at the time the TRO was entered and extended December 2018, these obligations of Link Motion remained outstanding.

69.     As set forth above, the events necessary to fully complete the Tongfang transaction never occurred. Upon entry of the preliminary injunction, Link Motion was barred from issuing instructions to transfer the shares of FL Mobile to Tongfang, Link Motion was barred from transferring the shares to FL Mobile, and the shares of FL Mobile continued to be held in trust by Dr. Shi pursuant to the Supplemental Agreement.

**D.     The Tongfang Award is not a "sham," the record suggests that the Receiver did have notice of that arbitration, and there was no complete defense to Tongfang's claim.**

70.      In their notice of motion, Defendants contend that the Tongfang Award was a "sham." Defendants contend that (i) that Dr. Shi improperly represented Link Motion in arbitration commenced by Tongfang against Link Motion (the "**Tongfang Arbitration**") without notifying the court-appointed receiver for Link Motion (the "**Receiver**"), and (ii) that Dr. Shi "withheld" notice of that proceeding. The documentary evidence reviewed in connection with this action shows that Defendants' contentions lack merit and that Plaintiff's allegations are well-supported by the evidence available.

71.     Based on my review of the evidence, including findings by an arbitrator in a separate arbitration before the HKIAC, and consideration of the timeline, it appears that Dr. Shi did not receive emails from the arbitrator in the Tongfang Arbitration because he had lost control over his former Link Motion email accounts in April 2019, before those emails were sent. Therefore, he could not have withheld emails that he never received. Dr Shi is aware of at least

one individual who had administrative access to his corporate email accounts before he lost control of those accounts. It is reasonable to conclude that this individual wrote the emails referred to in the Tongfang Award, at the direction of another person. Also, the initial papers from the Tongfang Arbitration were mailed to Link Motion's offices in China, which were then under the control of the Receiver. And the confusion concerning the arbitrations resulted from statements made by the Receiver regarding the various arbitration proceedings pending before the HKIAC.[11]

72.     It is Plaintiff's position that Defendants' focus on the Tongfang Arbitration and the Tongfang Award is a red herring because Plaintiff's damages theories do not depend on the Award.

### *Dr. Shi did not "withh[o]ld" or control the Tongfang Arbitration*

73.     Referring to references to emails in the text of the Award, Defendants contend that Dr. Shi improperly controlled Link Motion's representation in the Tongfang Arbitration. But the records show otherwise.

74.     In the Tongfang Award, the arbitrator refers to certain emails purportedly sent to and from Dr. Shi. **Ex. 17** at p.4 ¶ 9, 11 at p.5 ¶ 12. Each of the emails referenced in the award were sent after April 2019. It appears that they were sent to and from Dr. Shi's former Link Motion email accounts "vincent@nq.com" and "vincent@lkmotion.com."[12] Defendants cite the arbitrator's references to these emails as evidence that Dr. Shi improperly represented Link Motion in the Tongfang arbitration and "withheld" the proceeding from the Receiver.

75.     But Dr. Shi claims that at the times of the emails referenced in the Tongfang Award, he did not have control over his Link Motion email accounts. Dr. Shi believes that an employee of Link Motion in China, Ms. Xu Ying, who had administrative access to his Company email

---

[11] *See also* **Ex. 43** at ¶ 34.
[12] Declaration of Vincent Wenyong Shi dated October 24, 2022 ("Shi Decl.").

accounts before he lost access to them, likely received and sent the emails referenced in the Tongfang Award.

76.     Dr. Shi's claim of loss of control over his corporate email accounts is corroborated by the text of the award issued in a separate arbitration entitled *Zhongzhi Hi-Tech Overseas Investment Ltd. v. Shi* that was also arbitrated before the HKIAC (the "**Zhongzhi v. Shi Award**") and other evidence reviewed in connection with the claim. **Ex. 18** is a copy of the final *Zhongzhi v. Shi* Award, dated August 23, 2019. In that arbitration the claimant, Zhongzhi Hi-Tech Overseas Investment Ltd. ("**Zhongzhi**") brought a claim against Dr. Shi individually in connection with a personal guaranty he had contributed in order to close a round of financing for Link Motion.[13] *See* **Ex. 18**. Paragraphs 14 through 41 of the *Zhongzhi v. Shi* Award show that the tribunal initially communicated with Dr. Shi by email to his corporate "vincent@nq.com" and "vincent@lkmotion.com" addresses through April 20, 2019. **Ex. 18** at ¶¶ 14-41.

77.     But beginning on April 25, 2019, Dr. Shi began communicating with the tribunal only through his personal email address "shiwenyong@263.net." **Ex. 18** at ¶ 42. In paragraph 47 of the *Zhongzhi v. Shi* Award, the claimant in that proceeding "requested that the Respondent's email addresses vincent@nq.com and vincent@lkmotion.com be removed from future circulation lists in this arbitration, as the Respondent no longer had access to these addresses and that the Claimant was in ongoing disputes with Link Motion, Inc." **Ex. 18** at ¶ 47. In paragraphs 48 through 52, the tribunal confirmed the veracity of Dr. Shi's personal email address "shiwenyong@263.net" and removed Dr. Shi's former email Company email addresses. **Ex. 18** at ¶ 48-51. The text of the award shows that from that point forward, the arbitrator communicated with Dr. Shi through his personal email address. *See* **Ex. 18**.

---

[13] Link Motion had pledged all of its assets, including the Tongfang Note, in order to secure the financing from Zhongzhi.

78.     Given Dr. Shi's use of his personal email in the *Zhongzhi v. Shi* Arbitration beginning on April 25, 2019, and his request that the arbitrator in that proceeding communicate with him through that address, it is reasonable to conclude that if Dr. Shi had actually received the emails referred to in the Tongfang Arbitration Award, he would have also requested that the arbitrator in that proceeding communicate with him at his personal email address in that proceeding as well, rather than his former "vincent@lkmotion.com" email address.

79.     Also, the statements by the representatives of Zhongzhi, as set forth in the *Zhongzhi v. Shi* Award, strongly suggest that those professionals believed that persons other than Dr. Shi were using his former "vincent@nq.com" and "vincent@lkmotion.com" email accounts in order to obtain some advantage in other litigation.  *See* **Ex. 18** at ¶ 47 (requesting removal of the Link Motion emails from the service list because "Respondent no longer had access to these addresses and that the *Claimant was in ongoing disputes with Link Motion, Inc.*") (emphasis added). The reference by *Zhongzhi* to "ongoing disputes with Link Motion, Inc." likely refers to a third arbitration between *Zhongzhi* and Link Motion (the "***Zhongzhi v. Link Motion Arbitration***"), which was also pending before the HKIAC at the same time and over which the Receiver assumed control. *See* **Ex. 19**.

80.     Dr. Shi also states that he is aware of at least one employee of Link Motion in China, Ms. Xu Ying, who had administrative access to his corporate email accounts before he lost control of them. *See* Shi Decl. ¶7.[14]

---

[14] It is also plausible that an administrative assistant in China may not have understood question from the arbitrator regarding legal representation. Under Chinese law, a corporation must have a "legal representative" who is recognized as having decision-making authority for the corporation. At the time the Tongfang Arbitration was commenced, Dr. Shi was registered as the "legal representative" of several of Link Motion's VIE entities in China. Records show that Mr. Guo, the agent of the Receiver, was later substituted as the "legal representative" of many of the Link Motion VIE entities.

81.     Other than their suggestion that Dr. Shi communicated by email with the arbitrator in the Tongfang Arbitration and refused to defend Link Motion in that proceeding, Defendants provide no other basis for their contention that Tongfang Award was a "sham."

82.     The arbitrator reports that Tongfang was represented by counsel (**Ex. 17** at p.2 ¶ 3, p.4 ¶ 11) and submitted various witness statements (**Ex. 17** at p.5 ¶¶14(1) and p.7 ¶18). The arbitrator issued a reasoned award finding that Tongfang had paid consideration under the SPA, Supplemental Agreement, and the Note but that Link Motion had breached its obligation to transfer the shares of FL Mobile to Tongfang. **Ex. 17** at p.9 ¶ 21. This finding is consistent with **Ex. 10** and **Ex. 12**, which shows that 63% of the shares of FL Mobile continue to be held in the name of Dr. Shi for the benefit of Link Motion. On December 14, 2018, the Court had issued an order enjoining Link Motion from transferring any of these shares. **Ex. 2**.

83.     Even if it is assumed to be true that Dr. Shi represented Link Motion in the Tongfang Arbitration, this would not have been a material fact. The crux of Tongfang's claim in the arbitration was that it had paid cash and given a promissory note to Link Motion in exchange for a 63% equity interest in FL Mobile. It was widely publicized that the TRO and preliminary injunctions were entered against Link Motion, **Ex. 20**, and that Link Motion was judicially restrained from transferring the FL Mobile shares. Accordingly, it is more than reasonable to conclude that there was no complete defense to Tongfang's claims.

*The Receiver had notice of the dispute with Tongfang but sought
to litigate the Note in a separate arbitration with Zhongzhi*

84.     Defendants also contend that Dr. Shi misleadingly portrayed arbitration concerning Zhongzhi as relating to the Tongfang Note. Dkt. 35 at 5. This assertion is based on statements made by Dr. Shi in a declaration filed in the *Baliga* Action on June 11, 2021 (which mirrors his

original declaration filed on November 4, 2020).[15] But Defendant's contention is without support. The confusion regarding the various arbitrations arose from earlier statements of the Receiver that characterized the *Zhongzhi v. Link Motion* Arbitration proceedings as relating to the Tongfang Note.

85.     In paragraph 33 of his February 21, 2019 Affirmation to the Hong Kong courts, the Receiver stated that he "is aware that arbitration proceedings may have been commenced through the Hong Kong International Arbitration Centre against Zhongzhi concerning the Note, but I currently have no further information concerning these arbitration proceedings." **Ex. 15**.

86.     In his April 16, 2019 letter, the Receiver told the Court that he had contacted the HKIAC to take control over arbitration proceedings before that arbitration authority. **Ex. 16**.

87.     At the time of the Receiver's statements in the February 21, 2019 Affirmation and the April 16, 2019 letter, Dr. Shi did not have access to the papers served in the *Zhongzhi v. Link Motion* Arbitration or the Receiver's communications with Tongfang (the Receiver has not yet produced any of these records). Thus, Dr. Shi reasonably believed that the *Zhongzhi v. Link Motion* Arbitration proceedings also related to the Note from Tongfang by way of consolidation or some other procedural process.

88.     The notice provisions in the documents required Tongfang to mail notices to Link Motion in China. After the Receiver was appointed in February 2019, Link Motion's offices were under the control of the Receiver.

89.     Based on the Receiver's April 2019 statements in the *Baliga* Action, and the notice requirements, it was also reasonable to conclude that the Receiver had received the notice of arbitration served by Tongfang.

---

[15] Dr. Shi's original declaration was filed on November 4, 2020. Subsequently, the Court ordered that the motion be withdrawn without prejudice pending resolution of other disputes. The motion to dismiss was refiled on June 11, 2021.

90.     The final award in the *Zhongzhi v. Link Motion* Arbitration makes clear that the Receiver intervened in that arbitration proceeding on behalf of Link Motion and attempted to assert counterclaims against Zhongzhi based on Tongfang Transaction and Note. **Ex. 19**.[16] Based on the Receiver's participation in that arbitration before the HKIAC, it is reasonable to conclude that the Receiver was aware of all other arbitrations before the HKIAC that related to Link Motion, including the Tongfang Arbitration.

91.     Dr. Shi's understanding at the time of the filing of the declaration referenced in Defendants' motion was not unreasonable given that procedural history. We now know that at least three arbitrations involving Link Motion and/or Dr. Shi were commenced and pending before the HKIAC at various times in 2019, 2020, and 2021. The Zhongzhi arbitrations against Link Motion and Dr. Shi were commenced first on December 20, 2018. But the Zhongzhi arbitration against Link Motion was delayed by several months because of disputes concerning the HKIAC's jurisdiction to hear the Receiver's claims regarding the Note in that proceeding. **Ex. 19** at p.9 ¶ 19.

92.     It now appears that the Receiver's April 3, 2019 demand to Tongfang is the event that caused Tongfang to commence the Tongfang Arbitration against Link Motion regarding the Note. In paragraph 3 of the Tongfang Award, the arbitrator states "Tongfang commenced these proceedings by a first Notice of Arbitration dated 23 April 2019." **Ex. 17** at p.2 ¶ 3. April 23, 2019 is one week after the Receiver's letter to the Court (**Ex. 16**) notifying the Court of the demand made on Tongfang and approximately three weeks after the demand. The proximity in time between the Receiver's "statutory demand" to Tongfang, and the commencement of the Tongfang arbitration suggests a strong causal relationship between these two events. It is also possible to

---

[16] This award was issued on February 16, 2021, eleven months after the Tongfang Award was issued.

infer that the issuance of the "statutory demand" by the Receiver was part of his chosen litigation strategy with respect to the *Zhongzhi v. Link Motion* Arbitration.[17]

93.     The Receiver's April 16, 2019 letter also shows that the Receiver notified the HKIAC of his appointment and demanded that he be granted the right to represent Link Motion's interests in arbitrations before the HKIAC. In paragraph 5 of that letter, the Receiver informed the Court that "[t]he Receiver, on advice of Hong Kong counsel, notified the Hong Kong International Arbitration Centre ('HKIAC') that a receiver has been appointed for Link Motion, Inc. in both the United States and Hong Kong." **Ex. 16** at p.2 ¶5.

94.     In the Receiver's April 16, 2019 letter, he also states that he reached out to HKIAC in "response to a[n] ongoing arbitration at the HKIAC that Link Motion, Inc heretofore had not responded to." **Ex. 16** at p. 2. It now appears that this statement refers to the claim in the *Zhongzhi v. Link Motion* Arbitration that was pending before the HKIAC at that time and which the Receiver had previously stated was related to the Note. *See* **Ex. 15** at p.8 ¶ 33.

95.     Because HKIAC had notice of and recognized the Receiver's appointment with respect to the *Zhongzhi v. Link Motion* Arbitration, it is likely that HKIAC also recognized the Receiver's authority with respect to the Tongfang Arbitration.

96.     The Receiver's prior statements and actions and the text of the award in the *Zhongzhi v. Link Motion* Arbitration reflect a litigation strategy to intervene in that arbitration for the purpose of raising claims concerning the Tongfang Note. Although the reasoning behind this strategy is unclear, the record shows that the Receiver himself considered the *Zhongzhi v. Link*

---

[17] Further, given that there was a two-week delay between the issuance by the Receiver of a "statutory demand" and the commencement of the Tongfang Arbitration, it is more likely than not that the Receiver or his agents had communications with representatives of Tongfang in that interim period.

*Motion* Arbitration to be connected to the Tongfang Note and that the Receiver had communication with the HKIAC regarding these issues.

97.     Also, by April 2019, the Receiver had been recognized in Hong Kong, **Ex. 16** at 2 ¶¶ 2, 12[18], and his agents had gained control over Link Motions' former headquarters in Beijing. Thus, it is reasonable to conclude that any written notices, such as those referred to in the Tongfang Award, were received at the former headquarters.

98.     This evidence supports the conclusion that the Receiver had notice of the dispute with Tongfang but declined to defend that arbitration.

### *Dr. Shi did not control the Tongfang transaction*

99.     Defendants also claim that Dr. Shi controlled the Tongfang transaction. But this contention is contradicted by the text of the Supplemental Agreement and the Note.

100.     As stated in the transaction documents, Tongfang is a segregated portfolio company organized under the laws of the Cayman Islands. Annexed hereto as **Ex. 21** is a true and correct of an excerpt of Part XIV of the Cayman Islands Companies Law. Section 216(1) of Part XIV of the Companies Law provides that "A segregated portfolio company may create one or more segregated portfolios in order to segregate the assets and liabilities of the segregated portfolio company held within or on behalf of a segregated portfolio from the assets and liabilities of the segregated portfolio company held within or on behalf of any other segregated portfolio of the segregated portfolio company or the assets and liabilities of the segregated portfolio company which are not held within or on behalf of any segregated portfolio of the segregated portfolio company." **Ex. 21** § 216(1).

---

[18] The Receiver also obtained an injunction order in Hong Kong. **Ex. 41**.

101.     The text of the Supplemental Agreement and the Note stated that Tongfang entered into these transactions "on behalf of Tongfang M&A Fund SP, being a segregated portfolio of [Tongfang]." **Ex. 10** at p.1 Preamble paragraph (1) and **Ex. 13** at p.1. Thus, Tongfang M&A Fund SP is the "segregated portfolio" that undertook the obligations under the Note and contracted for the rights provided in the Supplemental Agreement.

102.     Based these records, Tongfang M&A Fund SP (and not Dr. Shi) is the true party-in-interest with respect to Tongfang's rights and liabilities with respect to the SPA, Supplemental Agreement, Note, and Pledge Agreement.

103.     Dr. Shi's participation in the FL Mobile divestment was disclosed. Early in the process of divesting FL Mobile, Dr. Shi purchased 16.34% of the shares of FL Mobile from Link Motion. **Ex. 8** at ECF p.11. References to Dr. Shi's "participation" in the buying group involved in the Tongfang Transaction reflect the fact that Dr. Shi had personally invested money to purchase shares of FL Mobile. Dr. Shi's purchase of 16.34% of the shares of FL Mobile is also corroborated by the public shareholder records, which reflect that a total of 79.34% of the shares of FL Mobile are held under Dr. Shi's name—*i.e.*, the 16.34% owned by Dr. Shi for his own account and the 63% held in trust for Tongfang. **Ex. 12**.

104.     Defendants also quibble with Plaintiff's allegations that FL Mobile was later transferred to an affiliate of the Receiver. But this allegation is also well-supported by the evidence. As set forth above, Dr. Shi does not (and has never claimed to) personally own the 63% equity interest in FL Mobile held in trust pursuant to the Supplemental Agreement. He holds those shares only as a nominee for Link Motion, Xinjiang NQ, and originally Tongfang. **Ex. 10** at 3, Art. 2. But after the Receiver was appointed, control over all of Link Motion's Chinese subsidiaries and VIE companies was granted to Mr. Lilin "Francis" Guo ("**Guo**"). **Ex. 16** at 3 ¶ 10. Guo promptly used

this control to transfer to himself majority interests in many of Link Motion's former VIE companies, including Xinjiang NQ. Public shareholder records show that Guo now owns 59.675% of the equity of Xinjiang NQ. **Ex. 22** at 2. With a controlling interest in Xinjiang NQ, **Ex. 22** at 2, Guo now beneficially owns and controls all rights to the 63% of FL Mobile shares that are subject to the Supplemental Agreement. *See* **Ex. 10** at 3 Art. 2.

## II.  Plaintiff's damages theory is not speculative.

105.  In their motion, Defendants contend that Plaintiff's theory of causation and damages in connection with the Tongfang Note is too speculative because there are intervening causes that break the chain of causation. Dkt. 35 at 9.

106.  But Defendants' contentions are contrary to the documentary evidence concerning the Tongfang Transaction. Also, Defendants completely ignore Plaintiff's second theory of damages (the imposition on Link Motion of the costs of the Receivership and related litigation costs).

107.  Defendants' sole contention in their motion as to damages is that it was "false and speculative" to allege that "Tongfang would have paid the full amount owed to Link Motion for FL Motion." Dkt. 35 at 10. Defendants emphasize their contention that "Tongfang had already failed to satisfy the Senior Note issued to Link Motion." Dkt. 35 at 10.

108.  This contention by Defendants is incorrect and unsupportable. First, Defendants incorrectly state that the Tongfang Note was due on or around December 31, 2017. As set forth above, and in **Ex. 13**, the Note was actually due on December 14, 2018, with a 15 day grace period ending on December 29, 2018. **Ex. 15**.

109.  Second, press releases show a track record of payments by Tongfang over the course of 2017 against its obligations to Link Motion under the Note and the Share Purchase Agreement. **Ex. 11**.

110.     Accordingly, it is reasonable to infer from this record of past performance that Tongfang would have paid the Note in full on or before December 29, 2018 but for entry of the TRO on December 14, 2018, the extension of that TRO by Defendants, and entry of the preliminary injunction. Entry of the TRO was well-publicized by the "LKMForward" group that retained the Receiver for that purpose. *See* **Ex. 20** and **Ex. 15** at ¶ 18.

111.     And, even if Tongfang had not paid, but for the restriction against transfer, Link Motion would have had a valuable claim against Tongfang for payment on the Note. Because Link Motion was barred from completing its end of the bargain with Tongfang (due to the TRO and preliminary injunction), Tongfang was relieved of its obligation to pay the amounts due under the note. *See* **Ex. 17**. This resulted in the value of the Note being destroyed. As reflected in **Ex. 14**, the Note represented an asset reported on Link Motion's books at approximately $270.8 million (and a net gain of $180.4 million on the sale of FL Mobile shares).

112.     Further, Plaintiff alleges an entirely independent category of damages in the Complaint that Defendants do not even address.

113.     In the February 1, 2019 order appointing the Receiver in the *Baliga* Action, the Court ordered that "The Receiver and his professionals shall be paid on an hourly basis at a reasonable and customary rate for such work to be approved by the Court and paid promptly out of the Receivership Estate. All professionals retained by the Receiver shall submit invoices to the Receiver, which shall be submitted to the Court by the Receiver along with any other expenses. *All expenses approved by the Court shall be paid promptly by Link Motion.*" **Ex. 5** at p.6 § 6 (emphasis added).

114.     Plaintiff alleges in the Complaint that but for Defendants' legal malpractice, Link Motion would not be responsible for these costs. During a telephone conference before Magistrate

Judge Freeman in 2021, Receiver's counsel informed the Court that the Receiver had depleted the Company's available funds.

115.     Defendants do not contest in their motion that Plaintiff's theory of damages respecting the costs resulting from the appointment of the Receiver was speculative.

116.     Docket entries from the *Baliga* Action demonstrate that the Receiver has paid himself substantial amounts from Company funds and issued demands for other amounts that the Receiver claims to be the responsibility of the Company.

**III.       The Court's rulings in the *Baliga* Action do not bar this claim for malpractice.**

117.     Defendants also contend that the Court's rulings in the *Baliga* Action bar the claim for legal malpractice here.[19] Dkt. 36 at ECF 17-18.

118.     Defendants argue that Felicello Law P.C. was successor counsel to the Company after Defendants withdrew. This is not accurate because Felicello Law P.C. was not permitted to represent the Company until October 23, 2020 and then only for the limited purpose of bringing a motion to dismiss. **Ex. 23**.

119.     Defendants also argue that the Court's rulings in an August 25, 2022 Decision and Order (the "Decision and Order") bar the legal claim. In the Decision and Order, the Court granted in part and denied in part a motion by Dr. Shi to vacate the February 1, 2019 order entering the preliminary injunction and appointing the receiver. A copy of the Notice of Motion, dated June 11, 2021, and the Decision and Order are annexed hereto as **Exs. 24 and 25**.

120.     As set forth in the Notice of Motion, the application was to vacate a prior order and to dissolve a preliminary injunction and discharge the Receiver. **Ex. 24**.

---

[19] This contention does not appear in the Notice of Motion served with Defendants' Rule 11 letter.

121.     In the Decision and Order, the Court adopted the recommendation by the Hon.

Magistrate Judge Debra Freeman not to find that the receivership was *void ab initio*. **Ex. 25**.

122.     Nothing in the Decision and Order addressed legal malpractice or what would have

happened had competent counsel asserted defenses against the original application for entry of a

preliminary injunction and appointment of the Receiver. The basis of the Decision and Order was

the existing state of affairs in the *Baliga* Action, including the fact that Defendants had consented

to entry of the preliminary injunction and appointment of the Receiver. **Ex. 25** at 3 ("*absent

opposition from Defendants*, the Court granted the proposed Preliminary Injunction and

Receivership Order") (emphasis added).

123.     Defendants also contend that Dr. Shi never raised the issue of Baliga's lack of

standing in the *Baliga* Action. This is not accurate. At a hearing on March 29, 2019, Baliga's

counsel stated: "The shareholders purchased shares through ADRs from Deutsche Bank in New

York, the stock traded on New York stock exchanges," **Ex. 40** (*Baliga Action*, Dkt. 41 at 19:15-

19), suggesting that Baliga did not own his shares directly. At that same hearing, I argued that the

Court lacked jurisdiction and the action was improperly brought. *Id.* at 27:3-4. Subsequently, on

April 26, 2019, Baliga filed an affidavit explaining that he purchased Link Motion ADS. Dkt. 49.

After the Court dismissed Baliga's securities claim with leave to replead, **Ex. 39**, Baliga submitted

an amended complaint, in which stated that he "is currently and has at all material times of this

Action been a shareholder of LKM." *Baliga Action*, Dkt. 65 at ¶ 4. I continued to investigate

Baliga's status as a shareholder with sufficient standing to assert a derivative claim. And after I

was able to obtain a shareholder registry showing that Baliga was not a shareholder, I raised the

issue in a Rule 11 letter to The Seiden Law Group, then-counsel for Baliga, dated March 10, 2020.

Baliga withdrew all of his derivative claims on October 5, 2020.

**IV.**      **Plaintiff has standing to sue derivatively.**

124.    Annexed hereto as **Ex. 26** is a copy of the register of shareholders of Link Motion. Plaintiff is a registered shareholder of 70,175,439 shares of Class B common stock of Link Motion. **Ex. 26** at 7.

125.    Annexed hereto as **Ex. 27** is a true and correct copy of the decision of the Cayman Islands court in *Top Jet Enterprises Ltd. v. Sino Jet Holding Ltd.*, 2018 (1) CILR 18, 42-43 (Caymans Island Grand Court Jan. 19, 2018).

126.    Upon my review of the *Top Jet* decision, I concluded that it involved the issue of whether a shareholder of a Cayman Islands company has standing to bring a derivative claim against a third-party who is not a director of the company.

127.    I further concluded that the *Top Jet* decision found that a shareholder of a Cayman Islands company may assert a derivative claim against a third-party when (i) the person in control of the company has failed to "authorize and cause [the Cayman company] to enforce its rights and commence proceedings against" the third party, **Ex. 27** at p.42 ¶ 33(b), (ii) "the wrongdoers are in control of the company," **Ex. 27** at 42-43 ¶ 33(c), and the third-party was "a party or accessory to or closely associated with the conduct which gives rise to" the breach of duty that prevents assertion of the claim. **Ex. 27** at 47 ¶ 39. *Top Jet* accepted the movant's position that the level of misconduct necessary to qualify for the exception under *Foss v. Harbottle* was lower than fraud and could be established by a breach of the controller's fiduciary duty in favor of their own self-interests and the interests of the third-party. **Ex. 27** at 43 ¶ 35(a) to 45 ¶ 37.

V.      **Plaintiff's claim was not brought for any improper purpose.**

128.    Defendants contend that the legal malpractice claim was brought for an improper purpose in violation of Rule 11(b)(1). But in support of this contention, Defendants cite only to allegations against Dr. Shi made in the *Baliga* Action.

129.    In particular, Defendants cite to allegations by the Receiver purporting to have "uncovered substantial links between China AI and Dr. Shi, who has engaged in a 'pattern of egregious misconduct in which he has looted Link Motion, sabotaged its operations, and breached his fiduciary duties,'" citing Dkt. 269 at 2 in the *Baliga* Action. Dkt. 25 at p.12. Defendants also claim that "by late 2018," Dr. Shi "was the sole shareholder of China AI." Dkt. 35 at n.2.

130.    The statements cited by Defendants are allegations by the Receiver made in status report letters filed with the Court. They are not findings of fact. Dr. Shi has denied the Receiver's allegations in submissions made in the *Baliga* Action. And the report of an independent law firm engaged to investigate Dr. Shi's involvement with the FL Mobile transaction found that "there is not sufficient evidence to conclude that the agreements signed with Tongfang are related-party transactions that would require special procedures for approval." **Ex. 28** at 2. DLA was involved in the investigation that reached this conclusion. **Exs. 29, 30**.

131.    Defendants' allegation that Dr. Shi held an ownership interest in Plaintiff is also contradicted by documentary evidence. Mr. Hua Jingyuan submitted a declaration, dated May 27, 2020, in the *Baliga* Action setting forth the ownership history of Plaintiff. **Ex. 31**. Annexed hereto as **Exhibits 32, 33, 34, 35, 36, and 37** are copies of exhibits A through F to Mr. Hua's declaration.

132.    As Mr. Hua explained in his declaration, and as demonstrated by the exhibits, Dr. Shi has never had an interest in China AI. **Ex. 31** at ¶¶ 6-14. China AI is owned and controlled by Mr. Hua through an investment vehicle of which Mr. Hua is the sole owner. **Ex. 31** at ¶ 12. China AI is a significant shareholder of Link Motion, with two board seats. Mr. Hua approved this action

on behalf of China AI to protect its investment in Link Motion and to recover the damages caused by Defendants' legal malpractice. China AI did not bring this action for an improper purpose.

133.   DLA knew the particulars about the China AI investment because DLA represented the Company as counsel in that transaction. **Ex. 38**.

134.   Defendants also contend that Plaintiff's notice of voluntary withdrawal was filed for an improper purpose as a result of Magistrate Judge Figueredo's request for a briefing schedule on the motion to dismiss. This contention is incorrect.

135.   Plaintiff sought a voluntary dismissal because the Court had issued a Decision & Order in the *Baliga* Action dissolving the preliminary injunction that enjoined Link Motion from taking certain action. **Ex. 25**. Because the claim in this action is derivative, it belongs to Link Motion. Link Motion sought to assume control over the malpractice claim and asked China AI to dismiss its claim voluntarily so that Link Motion could re-file it before the expiration of the statute of limitations period applicable to the claim. *See* Dkt. 23.

136.   Although the Court found later ruled that the Link Motion Board's action to assume control over the claim violated its prior orders, the Court nonetheless declined to nullify the action of the Board and ruled that Link Motion may proceed with its malpractice claim against Defendants in the ordinary course.

137.   At the time that Plaintiff filed its Notice of Voluntary Dismissal, no motion practice and no discovery had occurred in this action.

138.   Wherefore, Plaintiff respectfully request the Court enter an order (i) denying in all respects the motion by Defendants; (ii) finding that neither Plaintiff nor its counsel brought this action for an improper purpose; (iii) finding that Plaintiff's allegations were not without basis in law or fact; (iv) finding that Plaintiff's claim in this action was not without basis in law or fact;

and (v) concluding, pursuant to Rule 11(b), that sanctions against Plaintiff and its counsel are not warranted; and granting such other and further relief as the Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 24, 2022

*/s/ Michael James Maloney*
Michael James Maloney
