UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHINA AI CAPITAL LIMITED,

<table>
<tr><td>Plaintiff,</td><td>21-CV-10911 (VM) (VF)</td></tr>
<tr><td>-against-</td><td></td></tr>
<tr><td>DLA PIPER LLP (US), and CARYN SCHECHTMAN,</td><td>**REPORT &<br>RECOMMENDATION**</td></tr>
<tr><td>Defendants,</td><td></td></tr>
<tr><td>-and-</td><td></td></tr>
</table>

LINK MOTION INC. f/k/a NQ MOBILE INC.,

Nominal Defendant.
-----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO THE HONORABLE VICTOR MARRERO, United States District Judge:**

Defendants Caryn G. Schechtman and DLA Piper LLP (US) ("DLA Piper") have moved for sanctions against Plaintiff China AI Capital Limited ("China AI") and Plaintiff's counsel, Michael Maloney and Rosanne Felicello of Felicello Law P.C., pursuant to Federal Rule of Civil Procedure 11 for filing a frivolous complaint that also contained false allegations. See ECF Nos. 35-37, 45. Plaintiff opposes the motion. See ECF Nos. 41-44. For the following reasons, I recommend that the motion be **GRANTED** and that Plaintiff and its counsel be awarded the reasonable costs and fees incurred by Defendants in defending this action.

## BACKGROUND

A. Factual Background

Plaintiff filed this legal-malpractice, shareholder-derivative complaint, on behalf of Link Motion Inc. ("Link Motion"), on December 20, 2021. See ECF No. 1 ("Compl.") ¶¶ 1-2. The legal-malpractice allegations in the Complaint relate to conduct by Defendants that occurred in a

separate lawsuit filed by Wayne Baliga against Link Motion and several of its officers and directors, including Dr. Vincent Wenyong Shi ("Shi"). See ECF No. 1 ¶¶ 1-2, No. 18-CV-11642.

Baliga commenced his suit on December 13, 2018, alleging that Shi and others were looting the company of its most valuable assets and seeking the appointment of an independent receiver to prevent further dissipation of the company's assets. Id. ¶¶ 15-22, 31, 37. That same day, Baliga notified Schechtman and DLA Piper via e-mail of the filing of the complaint and of Baliga's intent to file an Order to Show Cause ("OSC") the next day, seeking a Temporary Restraining Order ("TRO").[1] See ECF No. 37-1; Compl. ¶ 50. On December 13, Schechtman forwarded the e-mail from Baliga's counsel to Shi and another Link Motion director, asking them to "[p]lease instruct DLA if you would like us to respond." ECF No. 37-1 at 2.[2] Schechtman also stated that they "should have a call immediately to discuss—as action will be taking place tomorrow," and she added that "DLA has still not received a retainer so we would need to receive that as well." Id. Later that same day, Schechtman followed up, asking Shi, "[d]id you see the lawsuit that was filed. They are going into court in 12 hours to get a restraining order against the company."[3] ECF No. 37-2 at 5. The next day, December 14, Schechtman asked Dr. Shi, "Do you want me to send an associate?" Id. at 4. Shi responded, "OK, thanks." Id. Schechtman subsequently told Shi in an e-mail that DLA Piper would "send an

---

[1] In 2018, Link Motion retained DLA Piper to represent it in connection with a corporate transaction (see Compl. ¶¶ 22-25) and evidently because of that representation, Baliga's counsel notified Schechtman of the filing of the complaint and of Baliga's intent to seek a TRO. See ECF No. 37-1 at 2.

[2] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the court-generated page numbers at the top of the cited document.

[3] This communication, and many others discussed herein, occurred via a messaging application called "WeChat." See ECF No. 37 ¶ 4. Copies of those text messages are annexed to the Declaration of Nancy Hart. See id.

associate to Court in 12 hours to advise the Court that we have received no instruction from the Company due to the time difference and language barriers. It is possible that the Court will grant the application anyway." <u>See</u> ECF No. 37-3 at 2. Schechtman added, "How would you like us to handle?" <u>Id.</u>

On December 14, Baliga filed an OSC, seeking a TRO. <u>See</u> ECF No. 7, No. 18-CV-11642; <u>see also</u> Compl. ¶ 48. Defendants appeared on behalf of Link Motion at the hearing before the Court. Compl. ¶¶ 52, 58. On December 14, the Court entered a TRO, restraining and enjoining Link Motion, Dr. Shi, and the other defendants, from liquidating, transferring, or dissipating any assets of the company. ECF No. 7, No. 18-CV-11642.

On December 17, Schechtman reached out to Shi in a text message stating, "Vincent we need to discuss how the company wants us to handle the derivative action"—referring to the <u>Baliga</u> action. <u>See</u> ECF No. 37-2 at 5. The next day, December 18, Schechtman again contacted Shi via text message stating, "We have to discuss the derivative action. We need to enter a scheduling order on Friday US." <u>Id.</u> On December 20, Schechtman pressed Shi via text message to "bring us current on invoices"—presumably referring to fees owed for work previously performed by DLA Piper for Link Motion. <u>Id.</u> at 4.

On December 21, 2018, the parties in the <u>Baliga</u> action filed a joint letter, notifying the Court of Link Motion's agreement to extend the TRO and requesting a deadline of January 21, 2019, to respond to Baliga's motion for a preliminary injunction. <u>See</u> ECF No. 20, No. 18-CV-11642. Schechtman signed the joint letter as "Counsel for Defendant, Link Motion Inc." <u>Id.</u> at 2.

On December 28, 2018, Schechtman sent Shi a text message explaining that DLA Piper could not "open up a litigation matter" without "payment on outstanding invoices." <u>See</u> ECF No. 37-2 at 3. On January 6, 2019, Schechtman warned Shi via text message, "[W]e won't be able to

draft the briefs that are due on [t]he 21st"—referencing the brief that needed to be filed on behalf of Link Motion if the company wanted to oppose Baliga's motion for a preliminary injunction. Id. Schechtman explained that "we can't open the matter as we have not received the retainer and we are not up to date on payment." Id. The next day, January 7, Schechtman sent Shi a text message, asking when they could "speak" and explaining to Shi that "the insurance policy has a 2.5 million dollar retention which means it won't kick in until the company has paid 2.5 million toward legal fees on the claim." Id. Later on January 7, Schechtman again asked Shi, "Can we speak?" Id. On January 8 and January 10, Schechtman again followed up with Shi in text messages, both times asking for an opportunity to speak to Shi. Id. On January 14, 2019, Schechtman asked Shi, "When can we speak." Id. Schechtman informed Shi that she "need[ed] to let the other side and the court know what we are doing. We have to start drafting today. It's one week out"—referring again to the need to file briefing in opposition to Baliga's preliminary injunction motion. Id.

On January 14, 2019, DLA Piper sent an e-mail to Shi and the Link Motion Board, written in English and Mandarin, stating that the opposition to Baliga's motion for a preliminary injunction and appointment of a receiver was due on January 21, 2019. See ECF No. 37-4 at 3. The e-mail explained, "If we do nothing, the motion may be granted, which may include such relief as appointing a receiver over the company and a preliminary injunction restricting the Company from transferring assets." Id. at 3. The e-mail further explained, "We have repeatedly asked for instruction on how to proceed but have not received any guidance from the Company or the individual defendants and advised that if we do not receive payment for legal services, we cannot take on this litigation matter." Id. at 4.

The next day, January 15, Schechtman sent another text message to Shi stating, "If I do not hear from you in 24 hours I will need to alert the Court that we have not been engaged to proceed further on the Company's behalf." <u>See</u> ECF No. 37-2 at 3. On January 17, Schechtman again contacted Shi via text message stating, "I have not heard from you. We have not prepared briefs and will not be in a position to represent the company in the derivative action." <u>Id.</u> Later that same day, Schechtman told Shi, "Can you give me a quick call. I want to avoid withdrawing as Counsel on the derivative action because it will look bad for the company. Instead I would prefer for the company to agree that it isn't submitting papers on Jan 21." <u>Id.</u> A few hours later, Schechtman again reached out to Shi via text message stating, "We must speak. When can you talk?," adding, "I need you to confirm that we can tell the court you aren't responding." <u>Id.</u> at 2.

On January 18, 2019, DLA Piper followed-up on its e-mail from January 14, forwarding the prior email in its new communication with the company. <u>See</u> ECF No. 37-4. In an e-mail to Shi and the Link Motion Board, written in both English and Mandarin, DLA Piper indicated that it had "not heard back from [the company]" regarding the January 14th e-mail. <u>Id.</u> at 2. The e-mail continued:

> [I]f we do not hear back from you within 24 hours, DLA will assume that we have Link Motion's consent not to oppose the motion [for a preliminary injunction]. As explained below [(referencing the January 14 e-mail)], we reiterate that if Link Motion does not respond, the motion may be granted, which may include such relief as appointing a receiver over the company and a preliminary injunction restricting the Company from transferring assets, attorneys' fees and cost, and other such relief that the Court may deem appropriate. It may also include relief as to Plaintiff's request for an order requiring the Defendants to restore all assets transferred to third parties within the past ninety days. It may include other relief as well. Further, if we do not hear back from you within 24 hours, we will also assume that we have Link Motion's consent to withdraw from representation.

Id. The e-mail further stated that if the company did not respond, DLA Piper would notify the Court that the company would not be submitting an opposition to Baliga's motion for a preliminary injunction and appointment of a temporary receiver. Id.

On January 19, 2019, Schechtman sent a text message to Shi, asking him to call her and stating that they "need[ed] to speak." See ECF No. 37-2 at 2. Separately, Schechtman contacted Crystal Zhanglu, a Senior Legal Manager at Link Motion, via text message and said: "Crystal it is important that I speak with you and Vincent as soon as possible. When can we speak." Id. at 5. On January 20, Schechtman continued her efforts to speak with Shi, asking Shi via text message: "[Y]ou owe me the courtesy of a call. Please call me." Id. at 2. Later on January 20, Schechtman asked Shi: "Do you want us to do the answer. We will need some payment. Otherwise I'm not sure what to recommend. You don't want a default judgment entered. Answers are not that expensive." Id. About an hour later, Schechtman sent another text message asking Shi, "I would like your consent for us to withdraw as your counsel from the litigation if you determine not to pay us to go forward." Id. Schechtman then told Shi, "I am trying to do what is best for the company but we cannot work for no payment." Id. On January 21, 2019, Schechtman asked Shi via text message to please "respond" and stated that "[t]he other option is we also withdraw as Counsel now." Id. Shi responded to Schechtman in a text message stating that he "fully respect[ed] and appreciate[d] [her] excellent work." Id. Shi explained that, "at this moment, it's very hard to make any further payment arrangement, even employees' payrolls were impacted. I'm very sorry about this situation and also bear huge pressure from many parties." Id.

On January 21, 2019, Baliga and Link Motion filed a joint stipulation, whereby Link Motion agreed not to oppose the entry of a preliminary injunction and obtained an extension of time to answer or otherwise respond to the complaint. See ECF No. 22, No. 18-CV-11642. In the

6

stipulation, DLA Piper represented that it was acting as "Counsel for Defendant Link Motion Inc." Id. at 3. On February 1, 2019, the Court entered an order granting Baliga's motion for a preliminary injunction and appointing a Receiver. See ECF No. 26, No. 18-CV-11642.

On March 1, 2019, Defendants moved for leave to withdraw as counsel for Link Motion. See ECF No. 28, No. 18-CV-11642. In a letter to the Court, Schechtman explained that DLA Piper sought to withdraw as counsel, because Link Motion "has been unable to pay DLA's legal fees and has represented that it cannot do so at this time," and "has not cooperated in its representation by failing to respond to inquiries." Id. at 1. Schechtman elaborated that Link Motion "had failed to pay outstanding and overdue legal fees owed to DLA despite repeated requests to pay." Id. at 3. Schechtman explained that the firm had "appeared in this action after [Baliga] filed [his] Complaint and [Order to Show Cause] in order to protect Link Motion's immediate interest in the emergency filing and to allow Link Motion the opportunity to determine whether to contest the matter." Id. Schechtman added that "Link Motion ha[d] failed to cooperate in the representation by failing to respond to inquiries, thus making the representation unreasonably difficult for DLA to carry out its representation effectively." Id. The Court granted Defendants' request to withdraw on March 1. See id. at 4; see also Compl. ¶ 82.

Following DLA Piper's withdrawal as counsel on March 1, 2019, Shi retained new counsel, and counsel filed a motion to dismiss and to discharge the Receiver on March 27, 2019. See ECF Nos. 35-37, No. 18-CV-11642. On March 29, 2019, the Court held a conference, at which counsel for Shi was present, and where counsel for Baliga indicated that Baliga was not a registered shareholder because he held Link Motion American Depository shares ("ADS"). See ECF No. 41 at 19, No. 18-CV-11642. In Shi's motion to dismiss, his new counsel did not argue

that Baliga lacked standing to bring his claims because he was a holder of ADS. See ECF No. 37 at 12-21, No. 18-CV-11642.

On March 19, 2020, the Receiver notified the Court that he had obtained a copy of an arbitration award, which was issued relating to an arbitration filed by Tongfang Investment Fund Series SPC ("Tongfang") in April 2019 against Link Motion (the "Tongfang Arbitration Award"). See ECF No. 269 at 1, No. 18-CV-11642. According to that award, Tongfang obtained damages of 2.52 billion RMB (approximately $400 million) against Link Motion. Id. The award indicated that Link Motion was not "legally represented in this arbitration." Id. Instead, the company "opted not to submit any document" and "did not file any Statement of Defence [sic]." Id. at 2. Further, the award noted that Shi, in an e-mail from May 5, 2019, "confirmed to [the arbitration tribunal] that he was acting on behalf of [the company]." Id. at 1-2.

B. Procedural Background

1. *China AI's derivative legal-malpractice suit against Defendants*

Plaintiff commenced this derivative, legal-malpractice action on behalf of Link Motion on December 20, 2021. See Compl. ¶¶ 1-2. In its complaint, Plaintiff alleges that Defendants acted as counsel for Link Motion in the Baliga action. See, e.g., id. ¶¶ 4, 58-59. According to Plaintiff, Baliga lacked standing to bring a derivative claim on behalf of Link Motion under the laws of the Cayman Islands, because he was a holder of ADS and thus not a "registered owner[ ] of shares." Id. ¶¶ 41, 44-46. Plaintiff alleges that Defendants, at the time of the TRO hearing on December 14, "knew or should have known that Baliga was not a registered shareholder and, therefore, lacked standing . . . to bring the derivative action." Id. ¶ 53. And because Baliga lacked standing, Plaintiff contends that Defendants should have known that the Court lacked jurisdiction to grant any provisional equitable relief. Id. ¶ 54.

Plaintiff avers that it did not receive advice from Defendants concerning Link Motion's "defense based on Baliga's lack of standing." Id. ¶¶ 69-71, 77-80. According to Plaintiff, Defendants' "failure to recognize Baliga's fundamental lack of standing and to assert that lack of standing as a defense to the Baliga Action" amounted to professional malpractice which was the but-for cause of Link Motion's damages. See id. ¶¶ 7, 55, 83, 85-94. Those purported damages flow, in part, from an arbitration involving Link Motion and Tongfang, which, according to Plaintiff, ultimately resulted in Link Motion losing one of its "most valuable assets at the time." See, e.g., id. ¶¶ 8, 65, 81, 85-91, 113.

At the time Baliga commenced his derivative lawsuit, Link Motion was a party to a Share Purchase Agreement ("SPA") with Tongfang. Id. ¶¶ 61-62. Pursuant to that SPA, Link Motion was required to transfer shares of FL Mobile, one of Link Motion's legacy businesses, to Tongfang. Id. ¶ 62. According to the Complaint, the "SPA was executory: Tongfang SPC had already conveyed to [Link Motion] consideration for the transaction," but Link Motion's obligation to transfer the FL Mobile shares to Tongfang had not yet been triggered. Id. ¶¶ 63-64. However, because of the TRO, Plaintiff contends that Link Motion was "restrained from performing its obligations to cause the transfer of FL Mobile shares [to Tongfang] in accordance with the SPA." Id. ¶¶ 65, 85. Plaintiff alleges that because Link Motion failed to transfer the FL Mobile shares, Tongfang commenced an arbitration proceeding against Link Motion and the arbitration resulted in the Tongfang Arbitration Award of approximately $396,000,000 against Link Motion. Id. ¶¶ 87-88. Further, Plaintiff claims that Link Motion's "inability to complete the transfer of FL Mobile" also resulted in the company losing the value it had ascribed to the Tongfang Transaction—a "deferred net gain" of $180,400,000. See id. ¶¶ 90, 113.

On September 6, 2022, Plaintiff filed a notice of voluntary dismissal without prejudice under Federal Rules of Civil Procedure 41(a)(1)(A) and 23.1. <u>See</u> ECF No. 22. Because Rule 23.1(c) requires that notice of a voluntary dismissal of a derivative action be given to other shareholders, the Court required Plaintiff to file a proposed notice, for the Court's review and approval. <u>See</u> ECF No. 28. On September 19, 2022, Plaintiff submitted its proposed notice. <u>See</u> ECF No. 30. On September 26, 2022, Defendants raised several objections to the proposed notice submitted by Plaintiff. <u>See</u> ECF No. 34. On September 26, 2022, Defendants filed the instant motion for sanctions under Rule 11. <u>See</u> ECF No. 35. On October 3, 2022, the motion for sanctions and approval of the notice to shareholders was referred to the undersigned for issuance of a Report and Recommendation. <u>See</u> ECF No. 38.

   2. *Link Motion's direct legal-malpractice suit against Defendants*

On September 12, 2022, Link Motion commenced an action in the Supreme Court of New York against Defendants, asserting a legal-malpractice claim arising out of Defendants' conduct in the <u>Baliga</u> action that was "the mirror-image" of the malpractice suit brought by Plaintiff here. <u>See</u> No. 22-CV-8313 (ECF No. 1 at ¶¶ 1-2; ECF No. 1-1 at ¶¶ 1-2, 4, 30-31; ECF No. 24 at 20). Defendants removed that action to this Court on September 29, 2022. <u>See</u> ECF No. 1, No. 22-CV-8313.

On May 26, 2023, the Honorable Victor Marrero issued an order holding that Link Motion's legal-malpractice claim was time barred and granting Defendants' motion to dismiss the complaint with prejudice. <u>See</u> ECF No. 30, No. 22-CV-8313.

On May 30, 2023, Plaintiff submitted a letter, seeking to adjourn a conference in the instant case, which was scheduled to address the pending motion for approval of Plaintiff's proposed notice to shareholders. <u>See</u> ECF No. 47. Counsel for Plaintiff contended that, given the

dismissal of Link Motion's direct legal-malpractice action by Judge Marrero, Plaintiff now had

the right to withdraw its notice of voluntary dismissal in this action and seek leave to amend the

complaint. Id. at 1. Counsel requested an adjournment of the conference in order to discuss with

Plaintiff its options going forward. Id. at 2. At the conference, which proceeded as scheduled on

June 1, Defendants argued that the derivative action must be dismissed, because Link Motion

had directedly asserted its legal-malpractice claim and the claim was dismissed on the merits.

See ECF No. 51 ("Tr.") at 4-6, 8-10.

Following the conference, Defendants submitted a letter brief, again arguing that

Plaintiff's derivative action must be dismissed because Link Motion asserted its claim directly

and dismissal of that claim on the merits barred Plaintiff's derivative action. See ECF No. 50 at

1-2. Plaintiff also submitted a letter, contending that a stay of the instant action was appropriate

while Link Motion awaited a decision by Judge Marrero on its pending motion for

reconsideration of the May 26 order. See ECF No. 49 at 2. Alternatively, Plaintiff argued that it

should be allowed to withdraw its notice of voluntary dismissal and be permitted to amend its

complaint. Id. at 2-3. Lastly, Plaintiff contended that claim preclusion typically applied to bar a

later filed case, whereas Plaintiff filed its claim first, before Link Motion. Id. at 1.

## **DISCUSSION**

A. <u>Legal Standards For Rule 11 Sanctions</u>

Federal Rule of Civil Procedure 11 imposes on a party who signs a pleading, motion, or

other paper "an affirmative duty to conduct a reasonable inquiry into the facts and the law before

filing." Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 551 (1991).

Among other things, under Rule 11 an attorney filing a pleading certifies, "to the best of the

[attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(1)-(3); see also Yeremis v. Amerit Fleet Solutions, No. 20-CV-4723 (GHW), 2021 WL 1565693, at *9-10 (S.D.N.Y. Apr. 21, 2021).

Under Rule 11(b), there are two grounds for sanctions: "the frivolous clause and the improper purpose clause." Yeremis, 2021 WL 1565693, at *10. The frivolous clause looks at "whether the party or attorney has made a reasonable inquiry into the facts, and whether the party has made a reasonable inquiry into the law." Id. "An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear . . . that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Morley v. Ciba–Geigy Corp., 66 F.3d 21, 25 (2d Cir. 1995) (cleaned up); see also Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd., 682 F.3d 170, 177 (2d Cir. 2012) ("[T]he standard for triggering the award of fees under Rule 11 is objective unreasonableness and is not based on the subjective beliefs of the person making the statement.") (alteration in original, citations omitted).

In determining whether to impose sanctions, courts consider a number of factors, such as:

> (1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern o[f] activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person

has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; [and] (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

Bobcar Media, LLC v. Aardvark Event Logistics, Inc., No. 16-CV-885 (JPO), 2019 WL 422613, at *3 (S.D.N.Y. Feb. 4, 2019). If "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). However, for a violation of subsection (b)(2) of Rule 11, a court may impose sanctions on an attorney, but not a party. See Holmes v. Allstate Corp., No. 11-CV-1543 (LTS) (DF), 2012 WL 627238, at *14 (S.D.N.Y. Jan. 27, 2012); Zagami v. Cellceutix Corp., No. 15-CV-7194 (KPF), 2017 WL 1180923, at *10 (S.D.N.Y. Mar. 29, 2017). Any sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); see also Tantaros v. Fox News Network LLC, No. 17-CV-2958 (GBD), 2018 WL 1662779, at *3 (S.D.N.Y. Mar. 16, 2018) ("[C]ourts must remain mindful that the point of Rule 11 sanctions is not to compensate or reimburse the defendants for the totality of their losses, but rather to punish and to deter future similar conduct.").

"Courts maintain a high bar for establishing a Rule 11 violation given judicial concern for encouraging zealous advocacy." E. Gluck Corp. v. Rothenhaus, 252 F.R.D. 175, 179 (S.D.N.Y. 2008). And, a finding that Rule 11 was violated "does not compel the imposition of sanctions." Braun ex rel. Advanced Battery Techs., Inc. v. Fu, No. 11-CV-4383 (CM) (DF), 2015 WL 4389893, at *12 (S.D.N.Y. July 10, 2015) (citation and internal quotation marks omitted). Nevertheless, "the decision whether or not to impose sanctions is a matter for the court's discretion." Bobcar Media, LLC v. Aardvark Event Logistics, Inc., No. 16-CV-885 (JPO), 2019 WL 422613, at *2 (S.D.N.Y. Feb. 4, 2019).

A party's motion for sanctions must comply with Rule 11's safe-harbor requirement and provide the opposing party with a draft of the motion 21 days before filing it with the court. See Rule 11(c)(2); see also ED Capital, LLC v. Bloomfield Inv. Res. Corp., 316 F.R.D. 77, 82 (S.D.N.Y. 2016). "The non-movant is then afforded a 21-day safe harbor period to withdraw or correct the challenged paper, claim, defense, contention, or denial before the movant is allowed to file or present the motion to the court." New V & J Produce Corp. v. NYCCaterers Inc., No. 13-CV-4861 (ER), 2014 WL 5026157, at *4 (S.D.N.Y. Sept. 29, 2014).

Before filing the instant motion, Defendants complied with the safe-harbor requirement in Rule 11(c)(2). Defendants notified Plaintiff of their intent to file the Rule 11 motion in a letter that outlined the specific grounds for sanctions raised in the instant motion. See ECF No. 37 at ¶ 16; ECF No. 37-14 (Ex. N). And Defendants filed an affidavit of service, which indicates that the letter was served on Plaintiff's counsel on March 8, 2022. See ECF No. 37 at ¶ 17; ECF No. 37-15 (Ex. O). Plaintiff did not respond to Defendants' letter. See ECF No. 36 at 13. Defendants did not file their sanctions motion until September 26, 2022, well after the 21-day period required under Rule 11(c)(2). See ECF No. 35.

B. Rule 11 Sanctions Are Warranted

Defendants advance three grounds in support of their request for sanctions against Plaintiff and its counsel. See ECF No. 36. First, Defendants contend that Plaintiff and its counsel violated Rule 11(b)(3), because they knowingly made false allegations in the Complaint. Id. at 20-23. More specifically, Defendants argue that Link Motion's public statements indicated that the Tongfang Transaction closed in December 2017, a year before Baliga filed his complaint in December 2018, and therefore the shares in FL Mobile were transferred to Tongfang long before the appointment of the Receiver. Id. at 21-22. In other words, Defendants aver that the appointment of the Receiver could not (and did not) prevent the transfer of FL Mobile shares

14

from Link Motion to Tongfang, notwithstanding Plaintiff's allegations to the contrary in the Complaint. See, e.g., Compl. ¶¶ 62-65, 85-87, 91.

Second, Defendants argue that Plaintiff and its counsel also violated Rule 11(b)(2), because the legal-malpractice claim is frivolous. ECF No. 36 at 25-30. Defendants contend that Plaintiff will be unable to establish multiple elements of its claim, including that Defendants actions or inactions were the but-for cause of Link Motion's damages. Id. at 26-27. Additionally, Defendants aver that Shi's retention of counsel after DLA Piper withdrew from the Baliga action was an intervening event that defeats causation as a matter of law. Id. at 28. Finally, Defendants claim that Plaintiff itself lacks standing to assert this derivative legal-malpractice claim on behalf of Link Motion. Id. at 28-29. For all of these reasons, Defendants argue that Plaintiff and its counsel filed a claim that has no chance of success.

Lastly, Defendants contend that Plaintiff and its counsel violated Rule 11(b)(1), because Plaintiff filed the Complaint for an improper purpose. Id. at 30. Defendants argue that the only reasonable inference from Plaintiff's decision to continue with its "patently deficient" claim is to harass Defendants and threaten significant reputational harm on the law firm and one of its lawyers. Id.

Defendants are correct that sanctions under Rule 11 are appropriate here. In commencing the instant action, neither Plaintiff nor its counsel could have reasonably believed that the allegations in the Complaint—concerning Link Motion's purported inability to transfer the FL Mobile shares because of the appointment of the Receiver—had evidentiary support. Likewise, Plaintiff's legal-malpractice claims suffers from multiple deficiencies that viewed collectively should have led counsel to conclude that the claim had no chance of success. Finally, Defendants raised all of these grounds in a letter to Plaintiff's counsel on March 7, 2022. See ECF No. 16.

Plaintiff nevertheless declined to voluntarily withdraw the action until six months later, in September 2022, see ECF No. 22, but only after Plaintiff's counsel filed a similar lawsuit, this time on behalf of Link Motion, against Defendants in state court. See ECF No. 1, No. 22-CV-8313. Then, after the direct legal-malpractice claim by Link Motion was dismissed with prejudice by Judge Marrero, Plaintiff baselessly argued that it should be permitted to withdraw its voluntary dismissal of this action and amend the Complaint. Simply put, Plaintiff's decision to continue pursuing this legal-malpractice claim against Defendants is objectively unreasonable and can only be viewed as an attempt to harass Defendants and cause reputational harm.

1. *Plaintiff made false allegations in its complaint in violation of Rule 11(b)(3).*

The Complaint alleges that prior to the entry of the TRO, "[w]hat remained to be performed under the SPA was [Link Motion's] obligation to cause the transfer of FL Mobile shares in accordance with the SPA." Compl. ¶¶ 62-64. The Complaint further alleges that the TRO and preliminary injunction "prevented [Link Motion] from satisfying its obligation to non-party Tongfang SPC (causing the transfer of the Company's legacy business, FL Mobile) after Tongfang SPC had already paid [Link Motion] consideration as required by the SPA." Id. ¶ 85. At the time Plaintiff filed its Complaint, neither Plaintiff nor its counsel could have reasonably believed that those allegations had or were likely to have evidentiary support. See G-I Holdings, Inc. v. Baron & Budd, No. 01-CV-216 (RWS), 2002 WL 1934004, at *13 (S.D.N.Y. 2002). Instead, numerous public filings by Link Motion—made by the company with the SEC—indicate that Link Motion transferred its shares in FL Mobile to Tongfang *before* Baliga filed his suit in December 2018. And these public filings would have been available to Plaintiff and its counsel before it commenced this action, after a reasonable inquiry into the evidentiary support for the factual allegations in the Complaint.

For instance, in March 2017, Link Motion announced, in a Form 6-K filing with the SEC, that it had entered into a "definitive agreement[ ]" to sell its interests in FL Mobile, and another business, to Tongfang. See ECF No. 37-6 at 5; see also ECF No. 37-7 at 4. The SPA, which was entered into on March 30, 2017, provided that the shares in FL Mobile would be transferred to Tongfang upon Tongfang completing its payment obligations. See ECF No. 228-4 at 7, No. 18-CV-11642 (Share Purchase Agreement). In a Form 20-F filed with the SEC for the 2016 fiscal year, Link Motion represented that it had "transferred [its] equity interests in FL Mobile and Showself (Beijing), while the purchasers still have certain period to complete their payment obligations." ECF No. 37-7 at 4; see also id. (describing the transfer as a "divestment[ ]" and discussing the financial "impact of these divestments" to Link Motion). Alongside the SPA, Tongfang and Link Motion executed a Supplemental Agreement on March 31, 2017. See ECF No. 42, ¶¶ 30-31; see also ECF No. 42-10 (Supplemental Agreement). That Supplemental Agreement provided for the FL Mobile shares to be held in trust by Shi until the "closing" of the SPA—that is, until Tongfang fulfilled its payment obligation. Id. ¶¶ 31-34.

Tongfang completed its payment obligation pursuant to the SPA in December 2017. In December 2017, Link Motion announced a "significant event[ ]," in a Form 6-K filed with the SEC—namely, the "completion of the FL Mobile Divestment." ECF No. 37-8 at 6. As is relevant here, the company's filing with the SEC stated:

> The Company announced in a press release on December 14, 2017 that it had *completed the divestment of FL Mobile* and sale of Showself's Live Social Video Business. The Company received in aggregate a total of approximately RMB 3,320 million, consisting of approximately RMB 1,550 million in cash and RMB 1,770 million in a senior note, which together *totals 100% of the agreed upon price* pursuant to the definitive agreements with Tongfang Investment Fund Series SPC.

ECF No. 37-8 at 6 (emphasis added). The filing confirms that Tongfang completed its payment

obligations by paying for the shares with cash and a senior note issued to Link Motion for RMB

1,770 million (the "Tongfang Note"). Id.; see also ECF No. 37-9 (Letter to shareholders from Shi

explaining that Link Motion received as "total consideration" for the transaction, "RMB 3.32

billion in cash and senior note from Tongfang"). The Tongfang Note was due to be paid in

December 2018. ECF No. 37-8 at 7 (indicating that it was a "one-year senior note" that could be

extended "by another 12 months at [Link Motion's] option"). As the company's statement with

the SEC makes clear, however, Link Motion received "100% of the agreed upon price pursuant"

to the SPA in December 2017, and consequently, Link Motion announced that it had reclassified

FL Mobile as "discontinued operations." Id. at 5-6.

Consistent with the SEC filing, Shi subsequently represented to Link Motion's

shareholders that the Tongfang Transaction had been completed. Shi, as Chairman of Link

Motion, told Link Motion's shareholders in a letter that was publicly filed on February 9, 2018,

that the transaction with Tongfang was "completed on December 14, 2017." ECF No. 37-9 at 5.

And on April 11, 2018, Link Motion, in a Form 6-K filed with the SEC, again reported that it

had "[c]ompleted the FL Mobile Divestment," explaining that the company "recognized $161.5

million of gain in the fourth quarter and booked $180.4 million as deferred gain from the

disposal of discontinued operations to be recognized when the receivables from the purchasers

are collected in future periods." ECF No. 37-10 at 5. All of these public statements consistently

represented to investors and the public that the Tongfang Transaction was complete and that

therefore Link Motion had fulfilled its obligation under the SPA to transfer its shares in FL

Mobile to Tongfang.

That conclusion is bolstered by the existence of the Equity Pledge Agreement. Tongfang and Link Motion executed an "Equity Pledge Agreement" when Tongfang issued the Tongfang Note. See ECF No. 37-11. That Equity Pledge Agreement gave Link Motion the right to retake ownership of the FL Mobile shares if Tongfang failed to pay the Tongfang Note. Id. at 2-3. In a Form 6-K filed with the SEC on September 10, 2018, Link Motion explained that "[i]n connection with the sale of FL Mobile shares" to Tongfang, "the agreements signed with Tongfang" gives Link Motion "the ability to *recover the shares* it has sold to Tongfang if Tongfang fails to pay its RMB 1.77 billion senior note delivered in payment for those shares." ECF No. 37-12 at 6 (emphasis added). And, tellingly, the Equity Pledge Agreement itself states that the "Target Assets"—defined as "63% equity of FL Mobile"—"are held by Party B," and Party B is defined in the agreement as "Tongfang Investment Fund Series SPC." See ECF No. 37-11 at 2. In other words, at the time of the Equity Pledge Agreement, the FL Mobile shares were "held by" Tongfang, not Link Motion. Id.

All of these public representations by Link Motion indicate that the transaction with Tongfang was completed in December 2017, and that as a result of that transaction, Link Motion received payment from Tongfang and transferred its shares in FL Mobile to Tongfang. Moreover, there would have been no reason for the Equity Pledge Agreement—allowing Link Motion to *recover* ownership in FL Mobile shares from Tongfang—if Link Motion had not transferred those shares to Tongfang. That agreement gave Link Motion a security interest in the shares precisely because the shares were held by Tongfang. None of Link Motion's public representations about the FL Mobile shares can be squared with the allegations in the Complaint that Link Motion's "obligation to cause the transfer of FL Mobile shares" had not occurred before the appointment of the Receiver in February 2019. See, e.g., Compl. ¶¶ 64, 86.

In defense of its allegations in the Complaint, Plaintiff argues that the transfer of FL Mobile shares could not occur until the Tongfang Note was paid, which was to occur at "the end of December 2018," and did not actually occur because the appointment of the Receiver prevented Link Motion from fulfilling its obligation to transfer the FL Mobile shares. ECF No. 41 at 16-17. As an initial matter, the principal on the Tongfang Note was due on December 14, 2018, the day the Court issued the TRO in the <u>Baliga</u> action, and interest in arrears on the Note was due on December 12, 2018, the day before the <u>Baliga</u> action was commenced. <u>See</u> ECF No. 42-13 at 11 (clauses 1.3 and 3.1). The Tongfang Note was thus due in full prior to the appointment of the Receiver, in February 2019.

In any case, Plaintiff's argument that the issuance of the TRO somehow interfered with Tongfang's repayment of the Tongfang Note is nonsensical. ECF No. 41 at 17. The TRO merely prohibited Link Motion from "transferring, liquidating, dissipating, assigning, and/or granting a lien or security interest or other interest in, any assets" belonging to the company. <u>See</u> ECF No. 7 at 1, No. 18-CV-11642. Nothing in the language of the TRO prevented Link Motion from enforcing the Tongfang Note, receiving payment under the Note, or foreclosing on its security interest in the FL Mobile shares if Tongfang failed to repay the Note. What's more, it is evident from the Tongfang Arbitration Award that the arbitrator found that Tongfang *had completed* its payment obligations in December 2017, and that Link Motion was obligated to transfer the Link Motion shares in December 2017—a year before <u>Baliga</u> filed his complaint. <u>See</u> ECF No. 42-17 at 8-10 (specifically, ¶¶ 21-22).

Plaintiff also argues that the word "completion" as used in the various press releases from the company referred only to "deconsolidation of financial results, not legal completion of Tongfang's obligations to Link Motion under the Note." ECF No. 41 at 17. That argument falls

flat given the public statements by Link Motion and Shi that unambiguously announced

completion of the transaction and receipt of full payment from Tongfang for the FL Mobile

shares. See, e.g., ECF No. 37-8 at 6-7 (Link Motion announcing in December 2017 that it had

"received . . . 100% of the agreed upon price" and "completed the FL Mobile Divestment"); ECF

No. 37-9 at 5 (Shi informing shareholders that "the transaction completed on December 14,

2017" and that "the total consideration received by [Link Motion] as of December 14, 2017

amounted to" cash and a senior note from Tongfang).

      To save its allegations, Plaintiff conflates completion of the bargained-for exchange

under the SPA with payment by Tongfang of the Tongfang Note. As Link Motion indicated in

public filings, it received "100% of the agreed upon price" for the FL Mobile shares, and it

accepted as payment for those shares a combination of cash and a note. See ECF No. 37-8 at 6-7.

Acceptance of that payment, in exchange for the transfer of the FL Mobile shares, consummated

the Tongfang Transaction in December 2017. Whether Tongfang subsequently repaid the

Tongfang Note is distinct from whether the transaction was completed. And, this distinction is

borne out by the company's own public filings which unambiguously stated that the transaction

was completed. Those public statements did not link completion of the transaction with payment

in full of the Tongfang Note.

      Moreover, even if the word "completion" in the company's public filings could be

construed as referring merely to the company removing the FL Mobile business from its balance

sheet (as Plaintiff now argues), that still does not explain the language in the Equity Pledge

Agreement. That agreement describes the FL Mobile shares as being "held by" Tongfang. See

ECF No 37-11 at 2. And in another public filing with the SEC filed on September 10, 2018, the

company, consistent with the Equity Pledge Agreement, represented that it had "the ability to

*recover the shares* it has sold to Tongfang if Tongfang fails to pay its RMB 1.77 billion senior note delivered in payment for those shares." See ECF No. 37-12 at 6 (emphasis added). The use of the word "recover" by Link Motion in reference to the FL Mobile shares further demonstrates that it no longer had possession of those shares.

In short, a reasonable inquiry by Plaintiff and its counsel would have revealed Link Motion's public statements about the Tongfang Transaction. And given those public statements, Plaintiff and its counsel could not have reasonably concluded that the factual allegations in the Complaint would have evidentiary support.

2. *Plaintiff's legal-malpractice claim is frivolous in violation of Rule 11(b)(2).*

Defendants also seek sanctions on the basis that Plaintiff's legal-malpractice claim is frivolous, in violation of Rule 11(b)(2). ECF No. 36 at 25-30. Even if the allegations in the Complaint concerning the inability to transfer the FL Mobile shares because of the Receiver's appointment had evidentiary support, Plaintiff's claim would still suffer from multiple deficiencies. When these obvious deficiencies are viewed collectively, the only plausible conclusion is that it was objectively unreasonable for Plaintiff to have commenced this action against Defendants.

To begin, the parties dispute whether Link Motion retained Defendants to represent the company in the Baliga action, thereby creating the existence of an attorney-client relationship. Compare ECF No. 36 at 23-25 with ECF No. 41 at 15-16, 21-22; see also Compl. ¶¶ 58-59. Plaintiff contends that DLA Piper represented Link Motion in the Baliga action and Defendants failed to provide any substantive advice or assert any defenses on behalf of the company. See ECF No. 41 at 15-18; Compl. ¶¶ 58-60. Defendants dispute that they were retained to substantively defend Link Motion, arguing that the company declined to respond to numerous

communications from Defendants concerning how to handle the action. ECF No. 36 at 9-12, 23-25, 27.

There is no dispute, however, that Defendants appeared in the <u>Baliga</u> action on behalf of Link Motion, in December 2018 after the TRO was filed, and subsequently sought leave to withdraw as counsel on March 1, 2019. <u>See</u> ECF Nos. 20, 28, No. 18-CV-11642. I need not decide whether Plaintiff's allegations that Defendants were formally retained by Link Motion have evidentiary support, because the communications between Defendants and Shi after the filing of the <u>Baliga</u> action demonstrate that it would have been exceedingly difficult (if not impossible) for Plaintiff to prove that Defendants breached a duty to Link Motion to act with the "skill, prudence, and diligence as other members of [the legal] profession commonly exercise." <u>See</u> <u>Schweizer v. Mulvehill</u>, 93 F. Supp. 2d 376, 393 (S.D.N.Y. 2000) (explaining elements of legal malpractice claim).

In that regard, it is apparent from the many communications by Schechtman to either Link Motion, Shi, or both that Link Motion and Shi refused to engage with Defendants in a discussion about how to respond to the TRO and preliminary injunction motions. <u>See</u> <u>supra</u> pp. 2-3. Those e-mails and text messages—including e-mails in English and Mandarin sent to the entire Link Motion Board of Directors—indicate that Schechtman diligently attempted, on numerous occasions, to discuss with Shi Baliga's complaint. Her communications went unanswered, the company refused to discuss the case (or even confirm that it wished to retain DLA Piper to defend the action), and Defendants were left with no guidance as to how to proceed. Against that backdrop of unanswered communications and nearly complete radio silence from Shi, Plaintiff's counsel could not have in good faith believed that it would be able to show that Defendants breached a duty to Link Motion by failing to raise a standing defense.

Turning to causation, Plaintiff and its counsel could not have reasonably believed that Defendants' actions were the but-for cause of Link Motion's alleged damages. See Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP, No. 12-CV-9459 (PAE), 2013 WL 3357921, at *4 (S.D.N.Y. July 2, 2013) (explaining that legal-malpractice claim under New York law requires evidence that defendant's conduct was "the proximate cause of a loss" and "actual damages"). According to Plaintiff, Defendant's failure to advise the company about Baliga's lack of standing resulted in the entry of the TRO and the appointment of the Receiver; those acts prevented Link Motion "from satisfying its obligation" to transfer the FL Mobile shares to Tongfang pursuant to the SPA; and in response to Link Motion's failure, Tongfang commenced an arbitration proceeding that resulted in an award of $396,000,000 against Link Motion. See Compl. ¶¶ 63-65, 67, 73, 76-78, 85-88, 91. As already discussed, however, Link Motion transferred the FL Mobile shares to Tongfang before Baliga commenced his suit.

Moreover, it appears that Link Motion did not defend against Tongfang's claims in the arbitration, and Shi did not notify the Receiver of the arbitration. The arbitration was initiated in April 2019, two months after the appointment of the Receiver in February 2019. See ECF No. 269 at 1, No. 18-CV-11642; ECF No. 26, No. 18-CV-11642 (appointing receiver). The Court's order appointing the Receiver instructed Shi and Link Motion to "ensure that litigation or arbitration matters [be] directed and controlled by the Company's lawyers, the appointed Receiver, and/or the non-conflicted board members as directed by the Receiver." ECF No. 26 at 3, No. 18-CV-11642. Despite that clear instruction, Shi did not disclose to the Receiver the existence of the Tongfang Arbitration. See ECF No. 269 at 1 (letter from Receiver to the Court stating, "I had no knowledge of the Tongfang Arbitration or the Award."). Instead, Shi represented to the arbitrator during the arbitration that he alone "was acting on behalf" of Link

Motion. Id. at 1-2. And even worse, neither Shi nor Link Motion mounted a defense to Tongfang's claims in the arbitration. Id. Given the utter failure of Link Motion to defend itself against the claims in the arbitration, it is speculative, at best, for Plaintiff to claim that Defendant's purported failure to "competently advise" Link Motion about a standing defense (see ECF No. 41 at 24-25) proximately caused the company to lose the arbitration, resulting in the issuance of the Tongfang Arbitration Award.

Plaintiff now contends that the e-mail communications between the arbitrator and Shi (where Shi purported to act on behalf of Link Motion) were in fact with someone other than Shi who was posing as Shi and using Shi's corporate e-mail account without authorization. See ECF No. 42 at ¶¶ 75-80. Putting aside the plausibility of that explanation, what is significant here is that an adequate investigation by counsel of the factual basis for Plaintiff's legal-malpractice claim should have uncovered that Link Motion was not represented by counsel in the arbitration, that it mounted no defense to Tongfang's claims, and that someone acting without authority was claiming to be Shi and representing the company in the arbitration, without the Receiver's knowledge. All of those facts should have led counsel to deeply question the viability of a legal-malpractice claim against Defendants, where the issuance of the Tongfang Arbitration Award is one of the alleged harms purportedly suffered by Plaintiff as a result of Defendants' alleged malpractice.[4] See Compl. ¶¶ 8, 87-91.

---

[4] Plaintiff tries to disavow its reliance on the Tongfang Arbitration Award (see ECF No. 41 at 18), arguing that the damages claimed here are the cost of the Receiver and the loss in value of the Tongfang Note. But in its brief Plaintiff also claims that "[t]he Tongfang arbitration resulted in an award of $396,000,000 . . . against the Company . . . and recission of the Note, rendering the asset worthless." ECF No. 41 at 13. In other words, Plaintiff's own argument links the loss in the Note's value to the issuance of the Tongfang Arbitration Award. In any case, as is apparent from the arbitrator's award, Tongfang fulfilled its payment obligations pursuant to the SPA prior to the appointment of the Receiver (see ECF No. 42-17 at 8-10), further undermining

Second, even if Defendants, in response to the TRO or preliminary injunction motions, had argued that Baliga lacked standing to bring his claims, the outcome would have remained the same, because, as the Court later concluded, it had jurisdiction to appoint the Receiver. See Flutie Bros. v. Hayes, 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006) ("In order to plead causation adequately in a legal malpractice claim, the plaintiff must show that but for the attorney's negligence, 'what would have been a favorable outcome was an unfavorable outcome.'") (citation omitted). In June 2021, Shi moved to vacate the preliminary injunction and discharge the receiver in the Baliga action. See ECF No. 227, No. 18-CV-11642. As part of that motion, the Court considered Shi's argument as to whether "at the commencement of this action, the Court lacked subject-matter jurisdiction over the action," because Baliga did not have standing under Cayman Islands law to bring derivative claims on behalf of Link Motion. See ECF No. 275 at 18, 20. Ultimately, in a Report and Recommendation that was adopted by Judge Marrero (see ECF No. 331 at 2, No. 18-CV-11642), Magistrate Judge Freeman concluded that although Baliga lacked standing to assert his derivative state-law claims for breach of fiduciary duty and unjust enrichment, he had standing to assert his derivative federal securities-law claims. See ECF No. 227 at 21-30, No. 18-CV-11642. Judge Freeman thus concluded that the Court had subject-matter jurisdiction over the case and the power to issue the preliminary injunction and receivership order. Id. at 30.

Plaintiff now argues that its legal-malpractice claim is not precluded by the Court's prior finding of standing because Judge Freeman considered whether to vacate the receivership order and that issue was "legally distinct" from whether Plaintiff has a viable claim of legal

---

any argument that Defendants' actions were the but-for cause of the loss in value of the Tongfang Note.

malpractice. ECF No. 41 at 23-24. But whether Judge Freeman was assessing Baliga's standing for purposes of determining the Court's jurisdiction to appoint a receiver or for some other reason is of no consequence. The critical point is that the Court already determined that Baliga had standing to bring his derivative federal-securities claims in December 2018. Consequently, and contrary to Plaintiff's argument (see ECF No. 41 at 23), the Court's jurisdiction to issue the preliminary injunction would not have been "a substantial issue in controversy" even if an argument had been raised by Defendants about Baliga's lack of standing.[5] This, too, goes to whether counsel could have reasonably believed, at the time it filed this action, that Plaintiff would be able to make a colorable argument that Defendants' actions were the but-for cause of Plaintiff's alleged damages.[6]

And, tellingly, Shi's new counsel following Defendants' withdrawal did not raise an argument that Baliga lacked standing because he held ADS shares. Shi retained new counsel in March 2019, before the commencement of the Tongfang Arbitration and shortly after the appointment of the Receiver in February 2019. See ECF No. 35, No. 18-CV-11642 (new counsel filing motion to dismiss for lack of jurisdiction). Counsel for Shi thus had time to challenge Baliga's purported lack of standing to bring his claims. And, Shi did file a motion to dismiss on March 27, 2019, where counsel argued that Baliga's claims should be dismissed, that the Receiver should be discharged, and that the Court lacked jurisdiction over Link Motion. See ECF

---

[5] And because the Court found that it had jurisdiction to appoint the Receiver, Plaintiff's counsel could not have had an objectively reasonable basis for claiming that Defendants' actions caused Plaintiff's damages, to the extent those damages are the cost of the Receiver. See ECF No. 41 at 12.

[6] Nor is there any merit to Plaintiff's contention that the Court relied on Link Motion's consent to issue the preliminary injunction. See ECF No. 41 at 23. Even with Link Motion's consent to the preliminary injunction, the Court still had to independently determine that a sufficient basis for the issuance of an injunction existed.

No. 37 at 12-21, No. 18-CV-11642. Shi's counsel, however, did not raise a challenge to Baliga's standing based on Baliga not being a registered shareholder. See ECF Nos. 37, 62, No. 18-CV-11642. Of course, Shi's counsel was not acting as counsel for Link Motion.[7] See ECF No. 41 at 26-27. But Shi's counsel raised numerous arguments for dismissal of Baliga's claims and yet he did not raise Baliga's lack of standing based on his ownership of ADS.[8]

Finally, putting aside whether Plaintiff could establish a breach of duty and causation, Plaintiff's claim suffers from yet another problem—a reasonable inquiry into the legal basis for the claim should have uncovered that Plaintiff lacked standing to assert its legal-malpractice claim derivatively on behalf of Link Motion. Plaintiff acknowledges that Cayman Islands law applies in determining whether Plaintiff has standing to sue derivatively. See ECF No. 41 at 28; see also Compl. ¶¶ 42-45, 95-98. Cayman Islands law prohibits derivative common-law claims except in narrow circumstances. See Winn v. Schafer, 499 F. Supp. 2d 390, 393, 396 (S.D.N.Y. 2007) (outlining four circumstances where derivative claim can be brought by shareholder under English law, which applies because Cayman Islands law is silent on issue of shareholder

---

[7] Whether the retention by Shi of new counsel could constitute an intervening event that severed the causal chain for a legal-malpractice claim—a point the parties dispute (Compare ECF No. 36 at 28, with ECF No. 41 at 27)—does not need to be determined for purposes of addressing Defendants' sanctions motion. The key point is that if Baliga's purported lack of standing were such an obvious and meritorious defense as Plaintiff contends, one would have expected Shi's counsel or the company's later counsel to have raised that defense. Neither did. And that fact goes to whether Defendants actions were negligent because they failed "to exercise the degree of skill commonly exercised by an ordinary member of the legal community." Schweizer, 93 F. Supp. 2d at 393.

[8] Plaintiff contends that Defendants inaccurately represent that Shi never raised the issue of Baliga's lack of standing. See ECF No. 42 ¶ 123. Citing to the transcript of a hearing on March 29, 2019, Plaintiff evidently implies that the argument was raised. At that hearing, Shi's new counsel merely alerted the Court to the fact that "the shareholders purchased shares through ADRs from Deutsche Bank in New York." See ECF No. 41 at 19, No. 18-CV-11642. But counsel never connected the dots. In other words, counsel never said that Baliga lacked standing to assert his derivative claims on behalf of Link Motion because he held ADS shares.

derivative suits). According to Plaintiff, it has standing as a registered shareholder to assert claims derivatively where conduct "qualifies as a fraud on the minority." ECF No. 41 at 29.

To establish the "fraud on the minority" exception, Plaintiff must show that the alleged wrongdoers "hold a controlling number of the company's shares or that they exercise *de facto* control over those shares." Winn, 499 F. Supp. 2d at 398. Additionally, the wrongdoer must have committed "fraud" which under Cayman Islands law examines whether there was any "self-dealing." Id. at 397-98. Further, to qualify for the fraud-on-the-minority exception and sue a third party other than the wrongdoer, "the plaintiff must establish that the third party directly participated in or was an accessory to the conduct of the controlling stockholders constituting the alleged breach of duty." In re Renren, Inc. v. XXX, Index No. 653594/2018, 2020 WL 2564684, at *29 (N.Y. Sup. Ct. May 20, 2020).

Plaintiff acknowledges that the alleged wrongdoer under its fraud-on-the-minority theory is Baliga. See ECF No. 41 at 29. Plaintiff's counsel, however, could not have reasonably believed that his arguments for application of the exception to Plaintiff were warranted by existing law. First, Baliga was not in control of the Company when he filed his suit. See Winn, 499 F. Supp. 2d at 396-98 (explaining that wrongdoer "must have control over a majority of the stock with voting rights" or exercised "*de facto* control" over those shares) (internal quotation marks omitted). The Complaint alleges that Baliga was a "former stakeholder" that had "lost the contest for control" of Link Motion's Board of Directors. See Compl. ¶¶ 20, 30, 37. Second, there are no allegations in the Complaint that Baliga breached a duty to Link Motion or engaged in fraudulent or self-dealing conduct at the expense of the minority, as required to qualify for the fraud-on-the-minority exception. Lastly, there no allegations in the Complaint that Defendants "directly participated in or [were] an accessory to" any fraudulent conduct by Baliga. Renren,

2020 WL 2564684, at *29. In fact, there is no indication whatsoever in the Complaint that DLA Piper and Baliga had any communications, let alone a relationship such that it could plausibly be inferred that DLA Piper directly participated or assisted in Baliga's fraudulent conduct.[9] See id. (explaining that pleading must allege with particularity "how the third party acted dishonestly in assisting the primary perpetrator of the fraud"). Nor are there any allegations to support a plausible inference that Defendants benefited from Baliga's fraudulent conduct. And Plaintiff was required to plead with particularity "how [Defendants'] acted dishonestly in assisting the primary perpetrator of the fraud," in this case, Baliga. Renren, 2020 WL 2564684, at *29 ("Where dishonest assistance is alleged, the pleading must identify and particularize the nature of the third party's conduct in assisting the breach of fiduciary duty, how the assistance caused the plaintiff's loss, and how the third party acted dishonestly in assisting the primary perpetrator of the fraud.").

\* \* \*

A reasonable inquiry by Plaintiff's counsel would have uncovered the apparent legal and factual deficiencies in Plaintiff's legal-malpractice claim. Further, Defendants alerted Plaintiff that they intended to seek sanctions if Plaintiff did not voluntarily withdraw its claim, and Defendants raised all of these deficiencies in their letter. See ECF No. 16. Even if one could conclude that Plaintiff and its counsel had a good-faith basis for initially filing suit, they certainly had no good-faith basis for continuing to pursue this claim after Defendants pointed out the

---

[9] To the extent Plaintiff is claiming that Defendants assisted in Baliga's purported fraud by failing to advice the company and raise the defense of lack of standing (ECF No. 41 at 30), that argument fails because, as already discussed, that defense was not meritorious and the Court had jurisdiction to issue the receivership order. See supra p. 26.

numerous deficiencies in the claim. Yet, Plaintiff ignored Defendants' letter and instead persisted with this suit for six months before filing a voluntary notice of dismissal. See ECF No. 23.

Viewing all of the deficiencies in Plaintiff's claim collectively, the only plausible conclusion to be drawn from pursuit of this litigation is that it was done to harass Defendants. That conclusion is reinforced by Plaintiff's most recent course of action. See ECF No. 49. Following Judge Marrero's dismissal of Link Motion's direct legal-malpractice claim on May 26 (see ECF No. 30, No. 22-CV-8313), Plaintiff sought to unnecessarily prolong this case even more, raising the possibility that it could withdraw its prior notice of voluntary dismissal and amend the complaint here. See ECF No. 49. But as Defendants point out (see ECF No. 50), any argument that Plaintiff can continue to pursue this legal-malpractice claim derivatively on behalf of Link Motion, given the dismissal on the merits of Link Motion's direct legal-malpractice claim, is patently meritless. As is well established, a derivative claim on behalf of a corporation is "unnecessary and duplicative, and should be dismissed" if the corporation "subsequently sues to assert claims on its own behalf." Ross v. Patrusky, Mintz & Semel, No. 90-CV-1356 (SWK), 1997 WL 214957, at *10 (S.D.N.Y. Apr. 29, 1997). Additionally, under New York law, a dismissal on statute of limitations grounds, as Judge Marrero concluded was appropriate in Link Motion's suit against Defendants (see ECF No. 30 at 9, No. 22-CV-8313), is deemed a dismissal on the merits. See Sun v. City of New York, 803 Fed. App'x 469, 471 n.3 (2d Cir. 2020). There thus is no derivative claim remaining for Plaintiff to pursue here. Plaintiff nevertheless argued for a stay of this case, seemingly suggesting that it should be permitted to withdraw its voluntary dismissal and amend the complaint.

31

**CONCLUSION**

For the reasons discussed, I respectfully recommend that Defendants' motion for Rule 11 sanctions be **GRANTED** and that Plaintiff and its counsel be awarded the reasonable costs and fees incurred by Defendants in defending this action.

**SO ORDERED.**

DATED:     New York, New York
               July 24, 2023

                                            _____
                                            VALERIE FIGUEREDO
                                            United States Magistrate Judge

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Victor Marrero. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**